**Michelle Lee KLIBER, Plaintiff,**

v.

**SOCIAL SECURITY ADMINISTRATION, and Secretary of Social Security, Defendants.**

**Civ. No. 10–2513 (JJK).**

United States District Court, D. Minnesota.

June 28, 2011.

---

Michelle Lee Kliber, Elk River, MN, pro se Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendants.

## MEMORANDUM OPINION AND ORDER

JEFFREY J. KEYES, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Michelle Lee Kliber seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's applications for disability-insurance benefits and supplemental-security income. This matter is before the Court on the parties' cross-motions for summary judgment (Doc. Nos. 11, 12).[1] The parties have consented to this Court's exercise of jurisdiction over all proceedings in this case pursuant to 28 U.S.C. § 636(c), and Federal Rule of Civil Procedure 73. (Doc. No. 9.) For the reasons stated below, the Court denies Plaintiff's motion and grants Defendant's motion.

## BACKGROUND

### I. Procedural History

Plaintiff filed her present applications for disability-insurance benefits and supplemental-security income on September 27, 2007, alleging a disability onset date of May 19, 2006. (Tr. 133–41.)[2] The applications were denied initially and on reconsideration. (Tr. 71–75, 77–82.) Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on January 22, 2009. (Tr. 83–84, 23–63.) On February 10, 2009, the ALJ issued an unfavorable decision. (Tr. 10–22.) Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on October 29, 2009. (Tr. 5–7.) The denial of review therefore made the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981; *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir.2005). On June 18, 2010, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties thereafter filed cross-motions for summary judgment. *See* D. Minn. Loc. R. 7.2.

### II. Factual Background and Medical History

Plaintiff was born on April 8, 1966. (Tr. 133.) At the time of her alleged onset of disability on May 19, 2006, she was 40-years-old. Plaintiff is a high school graduate, and has past relevant work as a Mash–Tub–Cooker Operator, which is medium-exertion work at a skilled level. (Tr. 167, 204.) Plaintiff alleged that seizures prevent her from working. (Tr. 162.)

On December 6, 2005, Plaintiff was brought to the Mercy Hospital emergency room in Coon Rapids, Minnesota ("Mercy Hospital"), on a peace-officer hold, after she had been drinking heavily and grabbed and possibly ingested a handful of Tylenol PM. (Tr. 289–90.) Plaintiff's history included borderline personality with suicide attempts, and hypothyroidism. (Tr. 289.) Plaintiff was admitted to the hospital for intoxication and possible intentional overdose. (Tr. 290.) Plaintiff told Dr. Ephra-

---

1. The Court will treat Plaintiff's miscellaneous motion for relief as a motion for summary judgment. *See* Doc. No. 11.

2. Throughout this Opinion, reference to the administrative transcript for the present case, Civ. No. 10–2513(JJK), is made by using the abbreviation "Tr."

im Ghide that she tried to overdose after getting into an argument with her boyfriend and daughter. (Tr. 292.) It wasn't clear, however, whether Plaintiff actually took the Tylenol. (Tr. 293.) The next day, Plaintiff underwent a psychiatric evaluation with Dr. Yoshiko Hapke. (Tr. 294–97.) She denied suicidal intent. (Tr. 294.) At that time she contracted for safety, said she was willing to go to AA, and was willing to get psychiatric follow-up. (Tr. 294, 297.)

On May 19, 2006, Plaintiff was brought to the Mercy Hospital emergency room and was treated by Dr. Thomas Wyatt after running her truck off the road. (Tr. 276.) Plaintiff reported that she did not remember what happened that day leading up to her arriving at the hospital. (Id.) She also stated that nothing like this had happened to her before. (Id.) However, she told the paramedics and nurses that she had similar episodes in the past. (Id.) Plaintiff did not appear to be in "too much distress," and she talked constantly on the phone while in the emergency department. (Tr. 277.) Her physical examination and a CT scan of her head were normal. (Id.) Dr. Wyatt noted that Plaintiff did not seem very concerned about her memory loss, and questioned whether there was an attention-seeking component to the incident. (Tr. 278.)

Approximately one week later, Plaintiff followed up with Dr. Natalie Christensen at Allina Medical Center–Coon Rapids ("Allina"). (Tr. 330–31.) Plaintiff reported that she had been found by a rescue crew after driving her car into a fence, but she did not remember how she got there. (Tr. 330.) She woke up about six blocks away from where she last remembered driving. (Id.) She said that she never had an episode like that before. (Id.) Dr. Christensen examined Plaintiff and diagnosed amnesia, muscle spasm, and upper respiratory infection. (Tr. 331.) Dr.

Christensen also arranged for Plaintiff to schedule a neurological evaluation. (Id.)

Plaintiff also saw Dr. Moeen Masood at the Minneapolis Clinic of Neurology, Ltd. after her May 19 accident. (Tr. 361–63.) Plaintiff stated that she was going to meet a friend at a grocery store and did not feel anything coming on before she lost consciousness. (Tr. 361.) She said that her truck hit a van and stopped without causing any damage to the vehicles or deploying the airbags. (Id.) She reported that she woke up with paramedics surrounding her, and she could not answer their questions or identify pictures of her kids from her wallet. (Id.) When she arrived at the emergency room, she thought she had lost the whole day, but it was only forty-five minutes after the accident. (Id.) She did not bite her tongue and was not incontinent during her loss of consciousness. (Id.) Plaintiff had some bruising and low back pain with the accident, and she previously had chronic low back pain from a work injury. (Id.) Dr. Masood ordered an EEG to rule out seizure disorder, and a cardiac echo and 30–day event monitor to rule out a cardiac cause for syncope. (Tr. 363.) Plaintiff reported that her back pain had improved since the accident, and Dr. Masood recommended conservative treatment. (Id.)

On June 25, 2006, Plaintiff presented to the emergency room at Mercy Hospital after she lost consciousness for up to an hour and awoke with a headache. (Tr. 251.) Plaintiff reportedly had slept poorly the night before. (Tr. 253.) Just prior to losing consciousness, Plaintiff stated that she was eating a sandwich and felt nauseous. (Tr. 253–54.) She woke up on the floor with her dog licking her face, and she was shaky, cold, and sweaty. (Tr. 254.) When she woke up, she called a friend who came over and called 911 because she looked pale. (Id.) Plaintiff's examination,

EKG, and basic metabolic panel were normal. (Tr. 252.) Dr. Robert Thomas, however, admitted Plaintiff to the hospital because he was concerned about a cardiac etiology or potentially a seizure. (*Id.*)

Upon evaluation the next day, Plaintiff told Dr. Masood the last thing she remembered was that she was nauseous and lethargic, and had been walking across the kitchen. (Tr. 256.) The next thing she remembered was "coming to" with her dog licking her face. (*Id.*) She had not felt light-headed, and she did not bite her tongue or lose bowel or bladder control. (*Id.*) No one witnessed the event. (*Id.*) During her evaluation, Plaintiff admitted to depression, anxiety, and stress related to her 15–year–old daughter's drug problems. (Tr. 256–59.) Plaintiff's laboratory data, CT scan of her head, MRI scan of her head, EEG, physical examination, and neurological examination were all normal. (Tr. 258.) Plaintiff's pulse rate was low, and Dr. Masood recommended that she continue to use the cardiac event monitor. (Tr. 259.) Dr. Masood opined that the incident could have been a dissociative episode or a syncopal episode from a cardiac arrhythmia. (*Id.*)

On June 27, 2006, Plaintiff was evaluated by Dr. Robin McAllister at Mercy Hospital for dissociative disorder. (Tr. 260–64.) Dr. McAllister reviewed Plaintiff's recent medical history. (Tr. 260.) Plaintiff reported that she had been tired and did not have much to eat the day she passed out. (*Id.*) Plaintiff explained that she had started to eat a sandwich, felt nauseous, and passed out in the bathroom,

and woke up to her dog licking her face. (*Id.*) Plaintiff reported that after her first episode in May, she was having more headaches, but no other symptoms. (*Id.*) Plaintiff described stress in her life but denied feeling depressed. (Tr. 261.) She reported long-standing sleep problems associated with working overnight and shift work. (*Id.*) Also, her appetite had been impaired since she had gastric bypass surgery in 2003.(*Id.*) Since her surgery, she stated that she felt nauseated when eating, even with small meals. (*Id.*) Plaintiff reported that she had been treated for depression in the past, and felt too sedated on Prozac. (*Id.*) She was no longer drinking alcohol regularly after breaking up with a boyfriend in May, who was into drinking and drugs. (*Id.*) Dr. McAllister noted that Plaintiff did not have alcohol in her system during the hospitalization. (*Id.*)

At the time of the interview, Plaintiff was unemployed and lived with a roommate. (Tr. 262.) She stated that she had been physically abused both in her past marriages and in a recent relationship. (Tr. 263.) Upon examination, Plaintiff's mental status was normal. (*Id.*) Dr. McAllister diagnosed adjustment disorder with mixed features. (*Id.*) She doubted that Plaintiff had dissociative disorder or somatization disorder. (*Id.*) She assessed a GAF score of 50 to 55.[3] (Tr. 264.) Plaintiff agreed to a trial of Trazadone[4] for insomnia. (*Id.*)

On June 29, 2006, Plaintiff drove herself to the emergency room at Mercy Hospital,

**3.** A Global Assessment of Functioning "GAF" score "of 41–50 indicates the individual has '[s]erious symptoms ... or any serious impairment in social, occupational, or school functioning....' " *Pate–Fires v. Astrue,* 564 F.3d 935, 938 n. 2 (8th Cir.2009) (quoting Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed Am. Psychiatric Ass'n 1994)). "A GAF of 51 to 60 indicates the

individual has '[m]oderate symptoms .... or moderated difficulty in social, occupational, or school functioning....' " *Id.* at 938 n. 3.

**4.** Trazadone, also sold under the brand name Oleptro, is indicated for treatment of major depression. *Physician's Desk Reference* 3446–47 (65th ed.2011).

where she was treated by Dr. Miguel Baza, after suffering an episode of near syncope. (Tr. 239.) She had just been released from the hospital the previous day after being treated for similar symptoms. (*Id.*) She had been given a holter monitor, and she said she had two recorded episodes of palpitation. (*Id.*) Dr. Baza noted that Plaintiff's review of systems was significant for intermittent chest discomfort and near syncope. (*Id.*) Plaintiff's episode of near syncope reportedly began while she was sitting outside reading a magazine, and she had sudden onset of headache. (Tr. 241.) She felt sweaty, light-headed, and nauseous but did not vomit. (*Id.*) She was shaky and frightened of losing consciousness, so she called a friend, and then went to the emergency room. (*Id.*) Plaintiff's examination at Mercy Hospital was negative and her observation period was uneventful. (Tr. 243–44.) Plaintiff was advised not to drive until she was event-free for six months and to refrain from activities that would put her at risk in the event of loss of consciousness. (Tr. 244.) It was noted that Plaintiff had recently accepted a job as a supervisor on a production line. (Tr. 242.) Dr. Baza admitted Plaintiff to Neurology under the care of Dr. Masood. (Tr. 240.)

On August 13, 2006, Plaintiff was brought to the emergency room at Mercy Hospital after she had an apparent seizure that lasted several minutes and was witnessed by her partner. (Tr. 231.) After the seizure, she had a mild headache and a three-minute period of confusion. (*Id.*) Dr. Baza examined Plaintiff. (Tr. 232.) Her physical examination and a CT scan of her head were normal. (*Id.*) Dr. Baza offered Plaintiff the option of a neurology consultation to test for seizure activity or to begin anti-seizure medication immediately, before the diagnosis was complete. (*Id.*) Plaintiff was convinced she had a seizure and chose to begin medication. (*Id.*) Dr. Baza prescribed Plaintiff Topamax.[5] (Tr. 232.) Dr. Miguel Baza ultimately diagnosed Plaintiff with possible seizure and headache. (Tr. 233.)

Plaintiff saw Dr. Masood the next day. (Tr. 358–60.) He noted that Plaintiff's boyfriend witnessed her "tonic clonic"[6] seizure, which lasted about a minute and was followed by confusion "for quite some time." (Tr. 358.) She bit her tongue, but was not incontinent. (*Id.*) Dr. Masood noted that Plaintiff was going to start a new job involving handling a lot of small tools and machineries, but that apparently she no longer planned to do so. (Tr. 359.) Dr. Masood reported that Plaintiff's neurological examination was normal, and recommended Plaintiff start Trileptal[7] and folic acid instead of Topamax. (Tr. 359.)

On September 17, 2007, Plaintiff's boyfriend brought her to the emergency room at Mercy Hospital and reported that she had two seizures that day. (Tr. 207.) Plaintiff was treated at that time by Dr. Sumanth Ambur. (*Id.*) Plaintiff was initially postictal, but was easily aroused and

---

**5.** Topamax is a brand name for the generic drug topiramate, which is used alone or with other medications to prevent and control seizures. http://www.webmd.com/drugs/mono–6019–TOPIRAMATE+–+ORAL.aspx?drugid=14494&drugname=Topamax+Oral.

**6.** "Generalized tonic-clonic (sometimes called primarily generalized) seizures typically begin with an outcry; they continue with loss of consciousness and falling, followed by tonic, then clonic contractions of muscles of the extremities, trunk and head. Urinary and fecal incontinence and frothing at the mouth sometimes occur." *The Merck Manual of Diagnosis and Therapy* 1825 (18th ed.2006).

**7.** Trileptal is a brand name for the generic drug oxcarbazepine, which is used to treat seizure disorders. http://www.webmd.com/drugs/mono–5005–OXCARBAZEPINE+–+ORAL.aspx?drugid=17984&drugname=trileptal+oral.

able to converse.[8] (*Id.*) Plaintiff said that she had been prescribed seizure medication in the past but could not afford it. (*Id.*) She admitted to occasional alcohol use, but denied a history of heavy alcohol use or dependence. (Tr. 208.) Upon evaluation, Dr. Ambur reported that Plaintiff was neurologically intact but was "amnestic to events surrounding her recent seizures." (*Id.*) Dr. Ambur noted that Plaintiff had a "completely total recovery to her baseline mental status and neurological function rapidly after arrival." (Tr. 209.) A CT scan of her head was normal. (Tr. 209, 211.) Dr. Ambur gave Plaintiff a prescription for Depakote[9] to treat generalized seizure. (Tr. 209.)

On October 5, 2007, Plaintiff saw Dr. John Bordwell at Allina for refill of her medications. (Tr. 309.) She was taking Depakote, and she reported that she did not have any symptoms since going to the emergency room in September. (*Id.*) Approximately one week later, Plaintiff saw Dr. Masood for follow up. (Tr. 355–57.) Dr. Masood noted that Plaintiff had been prescribed Tegretol but did not take it because she did not have insurance. (Tr. 355.) Dr. Masood also noted that Plaintiff had four seizures over one-and-a-half years, with the last two seizures on the same day, September 18, 2007. (*Id.*) The most recent seizures were described as grand mal, and Plaintiff bit her tongue and cheek but was not incontinent. (*Id.*) At that time, Plaintiff started taking Depakote, but it made her drowsy and not as attentive to her surroundings. (*Id.*) Plaintiff reported that she was having incidents of incontinence the last few months, but she was not sure whether she was having seizures during these incidents. (*Id.*) Plaintiff also complained of some back pain. (*Id.*) Dr. Masood stated that Plaintiff's neurological examination was normal and opined that the reason Plaintiff had breakthrough seizures was most likely because she had not been taking medication. (Tr. 356.) He advised that she "needs to be taking medication on a regular basis otherwise she would not be able to hold a job and drive." (*Id.*) He recommended that Plaintiff taper Depakote and begin taking Keppra.[10] (*Id.*)

On November 26, 2007, Dr. George Salmi reviewed Plaintiff's social-security-disability file and completed a Physical Residual Functional Capacity Assessment form. (Tr. 364–71.) He opined that Plaintiff did not have any exertional limitations, but she could only occasionally climb ramps and stairs and never climb ladders, ropes, and scaffolds, as a seizure precaution. (Tr. 365–66.) Dr. Salmi also noted that Plaintiff should avoid all exposure to hazards. (Tr. 368.)[11]

Dr. Masood completed a work-status report for Plaintiff on December 7, 2007. (Doc. No. 7–8, Ex. 13F).[12] He indicated that Plaintiff could not work at heights or in a night job, but that she could return to

---

**8.** "Most seizures end spontaneously in 1 to 2 min. A postictal state may follow a seizure (most commonly, generalized) and is characterized by deep sleep, headache, confusion, and muscle soreness; this state lasts from minutes to hours." *The Merck Manual of Diagnosis and Therapy* 1824 (18th ed.2006).

**9.** Depakote is indicated for monotherapy and adjunctive therapy of complex partial seizures and simple and complex absence seizures. *Physician's Desk Reference* 425 (65th ed.2011).

**10.** Keppra is an antiepileptic drug indicated for adjunctive therapy in the treatment of partial onset seizures. *Physician's Desk Reference* 3255 (65th ed.2011).

**11.** Dr. Aaron Mark affirmed Dr. Salmi's opinion on March 6, 2008. (Tr. 379–80.)

**12.** These page numbers of the social security administrative record were redacted. Therefore, the Court cites to the CM–ECF docket number, and the exhibit number from the administrative record index.

her previous job, starting at 20–30 hours per week and then full-time after a month. (*Id.* at 102 of 104.) Dr. Masood noted that Plaintiff should not apply for disability benefits. (*Id.*)

Plaintiff saw Dr. Masood on January 4, 2008, accompanied by her boyfriend. (Tr. 385.) Plaintiff's boyfriend reported she had not had any generalized tonic-clonic seizures since September 18, 2007, but sometimes she would forget things or have an unwitnessed episode of incontinence with tongue-biting. (*Id.*) Plaintiff reported that she was under some stress related to her daughter and was not sleeping well at night. (*Id.*) She also reported that she drank beer with her boyfriend over the weekends, sometimes only two, but "there are times that she drinks much more." (Tr. 355–56.) In addition, she drank anywhere from two to six cans of Mountain Dew per day. (Tr. 386.) Dr. Masood recommended that Plaintiff take her medication regularly, and reduce her caffeine and alcohol intake, which were probably disrupting her sleep and could precipitate seizures. (Tr. 385–86.) He increased her dose of Keppra and prescribed Ambien. (Tr. 386.) He also ordered an MRI and a sleep-deprived EEG, among other tests, and a 30–day event monitor because Plaintiff complained of intermittent palpitations and arrhythmia. (*Id.*)

Dr. Masood saw Plaintiff again on March 18, 2008. (Tr. 383–84.) He noted that she told him the same thing as in the past, that she had multiple seizures at invariable frequency. (*Id.*) She reported waking up at night or in the morning noticing that her cheeks were bitten or her bladder was incontinent. (*Id.*) She report-ed that her last seizure was on February 26, 2008, and her daughter witnessed her eyes rolling and extremities jerking. (*Id.*) She reported that the medics were called but did not take her to the hospital because her daughter was with her. (*Id.*) Plaintiff said, on average, she was having two or three seizures a week, some at night and some during the day. (*Id.*) At times, she found that she had bruises or realized she was not aware of her surroundings. (*Id.*) Dr. Masood recommended a second opinion because Plaintiff's seizures were not controlled despite her compliance with medication. (Tr. 384.) He opined that if her seizures were epileptic in origin, she might benefit from polypharmacy rather than monotherapy. (*Id.*) At that time, Dr. Masood agreed to complete Plaintiff's disability paperwork. (*Id.*)

On April 22, 2008, Plaintiff saw Dr. Joanne Rogin at the Minneapolis Clinic of Neurology on the referral of Dr. Masood. (Doc. No. 7–9, Ex. 15F.) Dr. Rogin noted Plaintiff's various seizures, as described by Plaintiff and her boyfriend, in a letter to Dr. Masood. (*Id.* at 30 of 55.) The first type started with a feeling of warmth and nausea with loss of memory for ten to thirty minutes, which occurred about once a week. (*Id.*) The second type was generalized tonic-clonic. (*Id.*) She sometimes had incontinent bladder with this and was confused for about half an hour, then fatigued. (*Id.*) This occurred at least once weekly. (*Id.*) Plaintiff also reported sleep difficulty. (*Id.*) Dr. Rogin found that although Plaintiff's test results and neurological examination were normal, Plaintiff's description of her seizures was consistent with "partial seizures with secondary generalization," [13] occurring at least weekly.

---

13. "Partial seizures (those of focal onset) are often due to structural abnormalities. The excess neuronal discharge begins in one cerebral cortex. Partial seizures may be simple (no impairment of consciousness) or complex (reduced but not complete loss of conscious-ness). . . . A generalized seizure may follow a brief partial seizure (called secondary generalization)." *The Merck Manual of Diagnosis and Therapy* 1823 (18th ed.2006). Generalization is when a partial seizure spreads and activates the entire cerebrum bilaterally. *Id.*

(*Id.* at 31 of 55.) Dr. Rogin recommended a 24–hour ambulatory EEG, an MRI of the brain, and a trial of Trazadone for sleep. (*Id.*)

Dr. Rogin saw Plaintiff again on October 30, 2008, in followup for "her recurrent spells versus seizures with failure of three drugs and normal studies." (Doc. No. 7–9, Ex. 15F at 25 of 55.) Plaintiff had undergone a 24–hour ambulatory EEG, which was within normal limits. (*Id.*) Dr. Rogin noted that Plaintiff's clinical episodes of sweating, nausea and warmth "were not associated with epileptiform activity or change in the background." (*Id.*) Plaintiff did not have generalized spells during the 24–hour EEG, and her brain MRI was normal. (*Id.*) Plaintiff reported she continued to have several episodes a week of waking up with her tongue and mouth bloody, and that her dog would find her on the floor. (*Id.*) Dr. Rogin also noted that Plaintiff tried Trazadone briefly, but did not like the way she felt. (*Id.*) Dr. Rogin reported that Plaintiff's neurological examination was normal, but when she performed hyperventilation, it reproduced some of the symptoms of her spells, including a feeling of warmth and nausea. (*Id.* at 26 of 55.) Dr. Rogin noted that the "definitive evaluation would be inpatient video EEG monitoring with discontinuation of medication if no spells occur[ed]." (*Id.*) Dr. Rogin recommended, however, that Plaintiff first begin taking Zoloft,[14] and if there was no improvement, then she could pursue the video EEG monitoring. (*Id.*)

On January 19, 2009, Dr. Masood completed a Seizures Residual Functional Capacity Questionnaire regarding Plaintiff. (Tr. 460–63.) He indicated that Plaintiff's diagnosis was seizure disorder, and she had one or two seizures a week, which were "historically maybe Complex Partial and Grand Mal." (Tr. 460.) He noted that Plaintiff had symptoms of confusion, headache and tongue biting for five to thirty minutes after a seizure. (Tr. 461.) He stated that Plaintiff was compliant with medication, and her medication had been at therapeutic blood levels. (Tr. 461–62.) He opined that Plaintiff's seizures would disrupt co-workers, and that Plaintiff would not be able to work at heights or with power machinery. (Tr. 462.) He also recommended that Plaintiff not operate a motor vehicle until her seizures were controlled. (*Id.*) Dr. Masood noted that Plaintiff would need an unscheduled break if she had a seizure but stated that he would not recommend any work until Plaintiff's seizures were controlled. (*Id.*)

## III. Testimony at the Administrative Hearing

### Plaintiff's Testimony

At the hearing, Plaintiff contested the note in her medical record that on weekends she drank from two beers to sometimes many more than two beers. (Tr. 31–33.) Specifically, she asserted that she did not go out every weekend. (*Id.*) She explained that she had a couple of cocktails when she went out with her boyfriend about once a month. (*Id.*) She also said that she had cut back on drinking Mountain Dew. (Tr. 33.)

Plaintiff testified that her fiancé worked nights, but that did not disturb her sleep because she went to bed when he left for work. (Tr. 30, 33.) Plaintiff also stated that she took her seizure medication faithfully. (Tr. 34.) She explained that she stopped taking it one month because she

---

**14.** Zoloft is a brand name for the generic drug sertraline hydrochloride, which is used to treat depression, panic attacks and other disorders. http://www.webmd.com/drugs/ mono–8095–SERTRALINE + – + ORAL.aspx? drugid=35&drugname=Zoloft + Oral& source=0.

could not afford it, and she resumed when Dr. Masood gave her samples. (Tr. 38.)

Plaintiff testified that she did not believe stress, heat, cold, or anything else caused her seizures. (Tr. 34.) She had seizures one or two times a week and she explained that her symptoms from the seizures were "coming out of it" with a sore or bloody mouth and bruises from falling down. (Tr. 34–35.) Her bladder was incontinent with approximately one out of three seizures, and she usually lost consciousness. (Tr. 35.) The medication Keppra was helping Plaintiff a little with the frequency of her seizures, but Plaintiff testified that the frequency of the seizures over the last year was about the same. (Tr. 36.)

Plaintiff stated that her last full-time job was in production assembly. (Tr. 39.) She was let go from that job and collected unemployment. (*Id.*) She explained that she was looking for a job when she started having seizures. (*Id.*)

**Testimony of Karl Sheiber**

Karl Sheiber testified that he had known Plaintiff since August 2006 and had lived with her for two and a half years. (Tr. 40.) He observed Plaintiff having four grand mal seizures over the previous two years. (Tr. 40–41.) He explained that her last grand mal seizure was eight months ago, and she lost consciousness and bit her tongue. (Tr. 41.) He also stated that when she has a grand mal seizure it takes her about twenty minutes to come back to reality, and then she does not feel like doing much the rest of the day. (*Id.*) Sheiber testified that Plaintiff also had mini-episodes, which he described as "spacing out." (Tr. 43–44.) In these episodes, she would get light-headed and put her head down, and when she woke up, she would not know how much time had

passed. (Tr. 44.) Sheiber saw this happen about once a month, but explained that Plaintiff has said that she had these episodes more often because she would wake up at night with a bloody or sore mouth. (Tr. 44–45.)

Sheiber testified that Plaintiff was able to care for her own needs, cook, use the dishwasher, do laundry, and grocery shop if someone else drove. (Tr. 42–43.) He also explained that they went out together once a week, but that Plaintiff did not drink to excess; instead, she usually had two to three drinks. (Tr. 45.)

**Medical Expert Testimony**

Dr. Andrew Murphy Steiner testified as a medical expert at the hearing. (Tr. 47.) First, he questioned Plaintiff about her minor seizures. (*Id.*) During that questioning, Plaintiff stated that even with her minor seizures, she had fallen down the stairs and fallen on the floor in the bathroom. (Tr. 47–48.) Plaintiff also stated that she had passed out on the occasions when she went to the emergency room, although Dr. Steiner pointed out that the medical records indicated "near syncope." (*Id.*)

After questioning Plaintiff, Dr. Steiner then testified that there were differing opinions from neurologists in the record concerning whether Plaintiff was having seizures on certain occasions. (Tr. 49.) He also pointed out that there were no injuries from Plaintiff's falls, and her compliance with medication was sometimes a problem. (*Id.*) He explained that he found the record difficult to interpret regarding the listing for petit mal seizures occurring more than once weekly because the listings required alteration of awareness or loss of consciousness. (Tr. 50.) In light of that, and the fact that her neurologist Dr. Masood [15] did not feel that Plaintiff was hav-

---

**15.** The record indicates that it was Dr. Rogin, not Dr. Masood, who questioned whether

Plaintiff was actually having seizures. (*See* Doc. No. 7–9, Ex. 15F at 25–26 of 55.)

ing actual seizures, Dr. Steiner stated that he could not say that this listing was met or equaled. (*Id.*) However, he did state that Plaintiff might have met the listing based on her own historical report. (*Id.*) Dr. Steiner ultimately opined that Plaintiff would have the following work restrictions: light exertional level with occasional bending and twisting due to back pain, and no work around unprotected heights and dangerous machinery. (Tr. 51.)

Upon questioning by Plaintiff's attorney, Dr. Steiner agreed that the phrase "losing time" could mean an alteration of awareness. (Tr. 52–53.) Dr. Steiner, however, did not believe that the seizure questionnaire in the record resolved the questions in his mind about the listing for petit mal seizures, because he was not sure whether the confusion and tongue biting related only to the grand mal seizures. (Tr. 53.) Dr. Steiner read the questionnaire as indicating Plaintiff had grand mal seizures once or twice a week, not complex partial seizures once or twice a week. (Tr. 54.) But he did testify that if she were having complex partial seizures with alteration of awareness once or twice a week, she would meet the listing. (*Id.*)

Dr. Steiner further explained that he felt evidence was lacking that there was a loss of awareness associated with seizures or pseudo-seizures more than once a week. (Tr. 55.) And when Plaintiff's counsel referred him to Exhibit 15F(6), a medical record dated April 22, 2008, Dr. Steiner felt it did not address his question because Dr. Rogin had concluded that Plaintiff was not having seizures, and she was only describing what Plaintiff had reported to her. (*Id.*) [16] Dr. Steiner also did not think that the symptom of incontinence helped explain the situation because it occurred with and without Plaintiff's spells, and it is something that is usually associated with grand mal seizures. (Tr. 56.) When asked whether the exhibits suggested the doctors felt Plaintiff was making her seizures up, Dr. Steiner stated that he did not see that in the record. (Tr. 57.)

### Vocational Expert Testimony

Wayne Onken testified at the administrative hearing as a vocational expert. (Tr. 57.) The ALJ asked Onken a hypothetical question regarding whether a person of Plaintiff's age, education, and past work, with the impairments and limitations described by Dr. Steiner, could perform Plaintiff's past relevant work. (Tr. 58–59.) Onken said no. (*Id.*) However, he said there were other jobs such a person could perform including light level, cashier II, with 5,000 such jobs fitting the hypothetical; and counter clerk, with 1,000 light, unskilled jobs fitting the hypothetical. (Tr. 59–60.)

For a second hypothetical question, the ALJ changed the limitations to no use of ladders, ropes, and scaffolds, and no more than occasional use of ramps or stairs, and no more than frequent motions like balancing, stooping, kneeling, crouching, and crawling. (Tr. 60.) Onken testified that such a person could perform the jobs he had just identified. (*Id.*) Onken also testified that if driving was excluded in the prior hypothetical, it would not change his testimony regarding the jobs such a person could perform. (*Id.*) He indicated his testimony was consistent with the Dictionary of Occupational Titles. (*Id.*)

Counsel for Plaintiff then asked Onken a hypothetical question assuming the person would have ten-minute to half-hour seizures once a week with no recall, and tonic-clonic seizures at least once a week

---

**16.** Plaintiff testified that she only saw Dr. Rogin twice, and that Dr. Rogin wanted nothing to do with her when she said she was applying for social-security disability. (Tr. 56–57.)

with confusion for thirty minutes, possible incontinence, and fatigue. (Tr. 61.) Onken testified such a person could not perform the jobs he had described. (*Id.*)

## IV. The ALJ's Decision and Findings

On February 10, 2009, the ALJ issued a decision concluding that Plaintiff was not under a disability as defined by the Social Security Act at any time from the alleged onset date through the date of the decision, therefore denying Plaintiff's applications for disability-insurance benefits and supplemental-security income. (Tr. 10–22.) The ALJ followed the five-step procedure as set out in the Code of Federal Regulations. *See* 20 C.F.R. § 404.1520(a)(4). The Eighth Circuit Court of Appeals has summarized the five-step procedure as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel,* 149 F.3d 893, 894–95 (8th Cir.1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of May 19, 2006, therefore meeting the requirement at the first step of the disability-determination procedure. (Tr. 15.) At step two, the ALJ found that Plaintiff had severe impairments of "seizure activity of unclear etiology[ ] and chronic low back pain." (*Id.*)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments the met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 16.) The ALJ relied on the testimony of Dr. Steiner that "while [Plaintiff's] seizure activity may have met the severity on a historical basis, the lack of evidence supporting the requisite alteration of consciousness precludes this finding." (*Id.*) The ALJ also cited Dr. Steiner's testimony that the record did not support the frequency of "one-to-two grand mal seizures." (*Id.*) And the ALJ cited Dr. Steiner's testimony that there were conflicting neurological opinions and conflicting testimony of Plaintiff and her partner in describing her seizure activity. (*Id.*)

The ALJ relied on Dr. Steiner's testimony and concluded that Plaintiff had the residual functional capacity to do the following:

> perform a range of light work described as lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and/or walking 6 hours of an 8 hour day, and sitting 6 hours of an 8 hour day, limited to occasional bending and twisting, balancing, stooping, kneeling, crouching, crawling and climbing of stairs and ramps, and avoiding work at heights and near hazardous machinery, climbing of ladders, ropes and scaffolds.

(*Id.*) In reaching this conclusion, the ALJ stated that Plaintiff's testimony of her inability to work due to uncontrolled seizures was inconsistent with the objective medical record from treating and examining physicians. (Tr. 17.) The ALJ noted that when Plaintiff had an incident of amnesia surrounding a car accident in May 2006, the CT scan of her head was negative, her EKG was negative, and Dr. Wyatt ques-

tioned an attention-seeking component because Plaintiff was somewhat inconsistent in giving her history. (*Id.*) The ALJ also noted that Plaintiff did not appear distressed by her loss of memory and talked on the phone constantly during her hospital stay. (*Id.*) The ALJ cited additional negative testing for seizures in June 2006, August 2006, September 2007, October 2007, early 2008, and April 2008. (Tr. 17–20.)

The ALJ stated that he placed significant weight on Dr. Steiner's opinion. (Tr. 20.) He also placed greater weight on Dr. Masood's opinion in Exhibit 13F over Dr. Masood's opinion in Exhibit 17F because the opinion in Exhibit 13F was based on an extensive workup of negative findings. (*Id.*) The ALJ further stated:

> By all accounts, the claimant should have been able to work if she remained compliant with medications. His opinion in exhibit 19F[ [17] ] appears to be based less on objective findings but more on subjective reports of frequency of seizure activity. As noted by Dr. Steiner, there are inconsistent reports on this account as well as the severity of activity. The claimant testified to having up to two grand mal seizures weekly along with smaller seizure activity. Karl Scheibel, her partner, testified to having only witnessed 4 grand mal seizures since 2006 with the most recent activity occurring 8 months earlier. He added that she experienced "mini" episodes of "spacing out" monthly. The undersigned is inclined to rely heavily on the testimony of Mr. Scheibel who works at night when the claimant is generally sleeping and spends the remaining day and evening with the claimant.

(*Id.*)

At step four of the disability-determination procedure, the ALJ found that Plaintiff could not perform her past relevant work. (Tr. 20–21.) However, at the fifth step of the procedure, the ALJ found that Plaintiff could perform other work that exists in significant numbers in the economy, including cashier II and counter clerk. (Tr. 20–21.) Therefore, the ALJ concluded that she had not been under a disability as defined in the Social Security Act from her onset date through the date of the ALJ's decision. (Tr. 22.)

## DISCUSSION

### I. Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

■ Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir.2006). "There is a notable difference between 'substantial ev-

---

**17.** The citation to Exhibit 19F appears to be a mistake. The seizure questionnaire is contained in Exhibit 17F, which is the last exhibit.

idence' and 'substantial evidence on the record as whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987) (quotation omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir.2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir.1998)). " 'Substantial evidence on the record as a whole,' ... requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, " '[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.' " *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

 In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir.1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994).

 The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n. 5 (8th Cir.2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir.1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir.2000).

## II. Analysis of the ALJ's Decision

In her Complaint, Plaintiff explains that she was awarded benefits as of March 2010, but is seeking benefits beginning May 2006. (Doc. No. 1, Compl. at 4.) She alleges that the ALJ's decision was flawed because there were witness and doctor statements supporting her disability due to epilepsy. (*Id.*) In her motion, she also contends that she cannot work as a cashier, as the vocational expert testified, because scanners cause seizures. (Doc. No. 11.) In addition, she asserts that she suffers from depression. (*Id.*) The Court will liberally construe Plaintiff's pro se pleading. *See Stone v. Harry*, 364 F.3d 912, 914 (8th Cir.2004) ("pro se complaints are to be construed liberally").

Defendant contends that substantial evidence in the record supports the ALJ's conclusion that Plaintiff did not meet or equal Listing 11.02 because the evidence does not support Plaintiff having two or more grand mal seizures a month. Defendant also contends that evidence does not support Plaintiff meeting or equaling Listing 11.03, which requires evidence of petit seizures more than once a week with alter-

ation of awareness or loss of consciousness. Defendant also contends that the ALJ reasonably relied on Dr. Steiner's opinion.

Further, Defendant contends that substantial evidence in the record supports the ALJ's RFC determination. Defendant notes that the ALJ credited Karl Sheiber's testimony regarding the frequency and severity of Plaintiff's seizures, and gave more weight to Dr. Masood's December 2007 opinion because it was more consistent with Plaintiff's negative testing for seizures than Dr. Masood's January 2009 opinion of disability. Finally, Defendant notes that although Plaintiff has mentioned depression in her motion, the record contained little evidence concerning depression. And at the hearing, neither Plaintiff nor her counsel ever mentioned depression. The Court will address the issues in the order of the sequential disability-evaluation process, beginning with whether Plaintiff had a severe impairment of depression.

### A. Whether Depression Was a Severe Impairment

A severe impairment is an impairment that significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). Basic work activities include understanding, remembering, and carrying out simple instructions, use of judgment, and responding appropriately to others in work situations. 20 C.F.R. § 404.1521(b)(3), (4), (5).

■ Here, Plaintiff did not allege depression in any of her Disability Reports to the Social Security Administration. (Tr. 158–68, 174–93.) She also did not testify to any limitations from depression. The record reflects that Plaintiff denied suicidal intent related to a May 2005 intoxication and possible ingestion of Tylenol incident. (Tr. 28994.) And the only psychiatric diagnosis in Plaintiff's medical records is

adjustment disorder with mixed features. (Tr. 262.) All of the submitted medical records were related to possible seizures. Accordingly, the record does not support a finding that Plaintiff had a severe impairment of depression from her alleged disability onset date of May 19, 2006, through the date of the ALJ's decision. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir.2001) (stating that the fact that claimant did not allege depression in the application for disability benefits was significant).

### B. Whether Plaintiff Met or Equaled Listing 11.02

The Listing of Impairments in the regulations describes impairments of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. §§ 404.1525, 416.925. Listing 11.02 is met or equaled under the following provisions:

Epilepsy-convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With:

A. Daytime episodes (loss of consciousness and convulsive seizures) or

B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.02. Section 11.00 of Appendix 1 provides further information about evaluation of Listings 11.02 and 11.03. It provides:

11.00 Neurological

A. Epilepsy. In epilepsy, regardless of etiology, degree of impairment will be

determined according to type, frequency, duration, and sequelae of seizures. At least one detailed description of a typical seizure is required. Such description includes the presence or absence of aura,[18] tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of the seizures reflects his own observations and the source of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following a prescribed antiepileptic treatment ... When seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment must include consideration of serum drug levels.

Plaintiff had incidents that Karl Sheiber witnessed and described in a manner that was consistent with typical "tonic clonic" seizures on August 13, 2006, and again on September 17, 2007. However, Plaintiff had not been on anti-epileptic medications on either of those occasions. (Tr. 207, 355.) She started taking medications regularly after her September 2007 seizures. (Tr. 309, 355–56, 386.) As the regulations explain, she could not meet or equal the listing until she had been consistently on medications for three months.

■ In March 2008, Plaintiff reported to Dr. Masood that her last seizure was on February 26, 2008, and her daughter witnessed her eyes rolling and her extremities jerking, but the paramedics did not take her to the hospital. (Tr. 383.) There is no medical record of that particular incident, and Plaintiff's daughter did not testify about it. Therefore, it cannot be relied upon in evaluating whether Plaintiff met or equaled the listing. *See Dakin v. Astrue*, No. 08–0794–CV–W–REL–SSA, 2010 WL 1253632, at *26 (W.D.Mo. Mar. 31, 2010) ("The listing requires either that a doctor witness the seizures or a person other than the claimant testify about the seizures.").

Then, in April 2008, Dr. Rogin opined that Plaintiff's description of her seizures was "consistent with partial seizures with secondary generalization." (Doc. No. 7–9, Ex. 15F at 31 of 55.) However, in October 2008, Dr. Rogin was not sure whether Plaintiff's "episodes" were actually seizures. (*See* Doc. No. 7–9, Ex. 15F at 26 of 55.) Dr. Rogin instead stated that "[t]he definitive evaluation would be inpatient video EEG monitoring," but recommended a trial of Zoloft first. (*Id.*) There are no later treatment records for Plaintiff in the administrative record.

■ There is nothing in the record to indicate any medical professional ever witnessed Plaintiff having a seizure, nor was there any testimony from anyone other than Sheiber explaining Plaintiff's seizures first hand. As explained in section 11.00 of Appendix 1, testimony from someone other than Plaintiff concerning the type and frequency of seizure is essential. Dr. Masood completed a questionnaire about Plaintiff's seizures in January 2009, but his report does not indicate that it was based on testimony regarding the nature and severity of the seizures by someone other than Plaintiff. (See Doc. No. 7–9, Ex. 17F at 52–55 of 55.) And after September 2007, although she reported a history of multiple seizures when she saw Dr. Ma-

---

**18.** Aura is an epileptic phenomenon perceived only by the patient. *Stedman's Medi-* *cal Dictionary* 183 (28th ed.2006).

# 1042

sood and Dr. Rogin in follow up, there are no records that Plaintiff was seen by a doctor immediately after having a seizure. As noted above, Plaintiff's fiancé, Karl Sheiber, testified at the hearing about witnessing Plaintiff's seizures. However, he testified that he witnessed her having four grand mal seizures over the previous two years. (Tr. 40–41.) This frequency does not meet the required listing level. In summary, the record does not support the frequency of grand mal type seizures as is required to meet or equal Listing 11.02.

## C. Whether Plaintiff Met or Equaled Listing 11.03

▆▆ Listing 11.03 is met or equaled under the following conditions:

11.03 Epilepsy-nonconvulsive epilepsy (petit mal,[19] psychomotor, or focal), documented by detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

Plaintiff's fiancé testified that he witnessed Plaintiff having episodes of "spacing out" once a month, but that Plaintiff told him she had more frequent episodes. (Tr. 43–45.) "Feeling 'spacy' does not satisfy the listing requirement for seizures." *Dakin,* 2010 WL 1253632 at *25. Dr. Steiner reviewed the entire record and did not believe it supported a finding that Plaintiff had alteration of awareness or loss of consciousness with petit mal seizures, although he agreed that by Plain-

tiff's own testimony, she would meet the listing. But Plaintiff's own testimony about the severity and frequency of her petit mal type seizures cannot satisfy the listing. *See* 20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.00 (stating that testimony from someone other than Plaintiff regarding the frequency and severity of seizures under Listing 11.03 is essential because the seizures were never witnessed by a medical professional).

Furthermore, the seizure questionnaire completed by Dr. Masood in December 2009 is too vague to indicate that Plaintiff met the frequency and severity of seizures under Listing 11.03. For instance, Dr. Masood indicated that Plaintiff's seizures were "[h]istorically, *maybe* complex partial and grand mal." (Tr. 460 (emphasis added).) And when asked to describe how long a typical seizure lasts, Dr. Masood described grand mal seizures lasting up to two minutes. (*Id.*) He did not say anything about petit mal or other nonconvulsive type seizures. Therefore, the record does not support a finding that Plaintiff met or equaled Listing 11.03.

## D. Whether the ALJ Erred in Weighing the Medical Opinions

▆▆ A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Leckenby v. Astrue,* 487 F.3d 626, 632 (8th Cir.2007) (alteration in original) (quoting *Prosch v. Apfel,* 201 F.3d 1010, 1012, 1013 (8th Cir.2000) (quoting 20 C.F.R. § 404.1527(d)(2))). "An ALJ may discount

---

19. "Absence seizures (formerly called petit mal) consist of 10– to 30–sec loss of consciousness with eyelid fluttering; axial muscle tone may or may not be lost. Patients do not fall or convulse; they abruptly stop activity, then just as abruptly resume it, with no postictal symptoms or knowledge that a seizure has occurred." *The Merck Manual of Diagnosis and Therapy* 1825 (18th ed.2006).

such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir.2001). "A non-treating physician's assessment does not alone constitute substantial evidence if it conflicts with the assessment of a treating physician." *Lehnartz v. Barnhart*, 142 Fed.Appx. 939, 942 (8th Cir.2005).

■■ Here, the ALJ gave the greatest weight to Dr. Steiner's opinion for the following reasons. First, Dr. Steiner had the opportunity to review the entire record and hear Plaintiff's testimony, and he was familiar with the social-security regulations. (Tr. 20.) Second, Dr. Steiner pointed out inconsistencies in the record regarding the frequency and severity of seizures. (*Id.*) Third, Plaintiff testified that she had up to two grand mal seizures a week and smaller seizure activity, but Karl Sheiber testified he witnessed only four grand mal seizures since 2006, and monthly episodes of "spacing out." (*Id.*) The ALJ relied more on Sheiber's testimony because he spent the days and evenings with Plaintiff. (*Id.*) Also, the ALJ gave more weight to Dr. Masood's earlier opinion that Plaintiff could return to full-time work because it was based on an extensive workup of negative findings. (*Id.*) His later opinion of disability was based less on objective findings and more on subjective reports of frequency of seizure activity. (*Id.*)

Therefore, both of the circumstances upon which a treating physician's opinion may be denied controlling weight are present here. Dr. Masood's January 2009 opinion was not based on clinical and laboratory and diagnostic techniques. No medical professional ever witnessed Plaintiff having a seizure, and all testing for seizure activity was negative. And there are also inconsistencies in the record. In December 2007, Dr. Masood opined that Plaintiff could work full-time with a few safety precautions. (Doc. No. 7–8, Ex. 13F at 102–04 of 104.) Plaintiff only saw Dr. Masood twice in 2008, and on the first occasion, he felt her caffeine and alcohol intake were disrupting her sleep and precipitating seizures. (Tr. 385–86.) When she continued to complain of frequent seizures, after he increased her Keppra, he referred her to Dr. Rogin for a second opinion on whether her seizures were of epileptic origin. (Tr. 383–84.) Plaintiff saw Dr. Rogin twice, once in April and once in October 2008. Plaintiff was never treated or evaluated during or shortly after a seizure in 2008. However, she reported a frequency of seizure activity much greater than when she began evaluation for possible seizures in May 2006 through January 2008. Even so, in October 2008, Dr. Rogin was not sure whether Plaintiff's "spells" were seizures, and she recommended that Plaintiff try Zoloft. (Doc. No. 7–9, Ex. 15F at 26 of 55.) If the Zoloft did not help her seizures, Dr. Rogin recommended video EEG monitoring, and cessation of medication if the test was negative. (*Id.*) There are no records concerning how Plaintiff did on Zoloft or whether she pursued video EEG monitoring.

Based on the medical records described above, Dr. Masood's January 2009 opinion could only have been based on Plaintiff's subjective complaints, and her boyfriend's description of her episodes. But, as the ALJ pointed out, their testimony was inconsistent regarding Plaintiff's seizures. Sheiber testified that he worked nights and "if [he was] not taking [his] little naps during the day [he and Plaintiff were] together most of the time." (Tr. 40, 46.) The last grand mal seizure he witnessed Plaintiff having was eight months before the hearing. (Tr. 41.) Otherwise, he witnessed Plaintiff "spacing out" about once a month. (Tr. 44.) He also described her

lesser seizures as incidents of Plaintiff saying she did not feel well, putting her head down to take a nap, and when she got up, thinking it had only been a minute when it was fifteen minutes. (*Id.*) Plaintiff, on the other hand, testified that she had both grand mal and minor seizures more than once weekly. It was reasonable for the ALJ to accept the testimony of a person who lived with and witnessed Plaintiff's episodes over Plaintiff's own testimony, given the difficulty a person would have in recognizing and describing their own seizure activity.

Dr. Steiner explained his opinion in detail, and it was based on the negative findings on objective testing in the record and the inconsistencies he pointed out, as well as his own medical expertise. It is proper for an ALJ to grant greater weight to a medical expert's opinion over a treating physician's opinion under such circumstances. *See Wagner v. Astrue*, 499 F.3d 842, 849–50 (8th Cir.2007) (affirming ALJ's decision to grant greater weight to consulting physician's opinion where there were inconsistencies in the record with the treating physician's opinion).

In summary, the ALJ's RFC determination, which was based on Dr. Steiner's testimony, is supported by substantial evidence in the record as a whole. Therefore, it was proper for the ALJ to rely on the vocational expert's testimony in response to a hypothetical question that included Plaintiff's RFC, as determined by the ALJ. *See Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir.2006) (finding the vocational expert's answer to the hypothetical question "constituted substantial evidence supporting the Commissioner's denial of benefits").

### CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff's Motion for Summary Judgment (Doc. No. 11), is **DENIED;**

2. Defendant's Motion for Summary Judgment (Doc. No. 12), is **GRANTED;** and

3. This case is **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**