# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3305

_____

Patricia A. Leckenby,    *
                         *
      Appellant,         *
                         *       Appeal from the United States
    v.                   *       District Court for the
                         *       Western District of Missouri.
Michael J. Astrue,[1] Commissioner    *
of Social Security,      *
                         *
      Appellee.          *


_____

Submitted: March 15, 2007
Filed: May 17, 2007
_____

Before COLLOTON, HANSEN and GRUENDER, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Patricia Leckenby appeals the district court's order affirming a final decision of the Commissioner of Social Security denying her application for social security disability benefits and supplemental security income. For the reasons discussed

---

[1]Michael J. Astrue has been appointed to serve as Commissioner of Social Security, and is substituted as appellee pursuant to Federal Rule of Appellate Procedure 43(c)(2).

below, we remand to the district court with directions to remand to the agency for reconsideration.

## I.    BACKGROUND

Leckenby applied in May 2004 for social security disability benefits and supplemental security income.[2]  She claimed an inability to engage in substantial gainful employment due to fibromyalgia, chronic back and knee pain, depression and other maladies.  The administrative record is replete with medical evaluations, the most relevant of which we summarize below.

Physician Richard D. Cunningham, M.D., treated Leckenby on at least four occasions from April 2002 through June 2003 for headaches, irritable bowel syndrome (possibly due to the earlier removal of her gall bladder), osteoarthritis, fibromyalgia, depression and possible carpal tunnel syndrome.  In June 2002, Dr. Cunningham reported that medication had not relieved Leckenby's fibromyalgia symptoms and noted that she was "aching all over and having cramps, diarrhea, and generally feels miserable."  Admin. Rec. at 192.  Dr. Cunningham's next treatment note, from June 2003, reported that Leckenby was "[h]aving more and more trouble" with pain in her shoulders, hips, back and legs.  Dr. Cunningham also noted at this time that Leckenby had poor memory and concentration, had experienced an episode of double vision, experienced frequent headaches and was "under a lot of stress."  *Id.* at 191.  In a

---

[2]Leckenby filed an earlier application for benefits in October 2001 that was denied by an Administrative Law Judge on May 6, 2004, and was not appealed.  In addition, subsequent to the application for benefits at issue here, Leckenby was awarded social security benefits in a determination from a later-filed application alleging a disability onset date of August 27, 2005.  As a result, the application under review here only concerns benefits for the time period of May 6, 2004 through August 26, 2005.

Medical Source Statement ("MSS") form[3] dated three days after that visit, Dr. Cunningham stated that Leckenby could stand or walk for a total of less than one hour during an eight-hour workday, could sit for a total of less than one hour during an eight-hour workday, and needed to lie down for 15 to 30 minutes on four to five occasions during an eight-hour day.

State-referred physician Stanley Hayes, M.D., examined Leckenby in August 2003, apparently in conjunction with an earlier application for social security benefits. Dr. Hayes noted generalized soft-tissue pain typical for fibromyalgia but found it "noteworthy that the patient gives an extremely dramatic and exaggerated withdrawal response to any area of her body that is minimally palpated." *Id.* at 201. Dr. Hayes concluded that Leckenby's functional restrictions were "subjective in nature." *Id.*

State-referred clinical psychologist David Lutz, Ph.D., examined Leckenby in January 2004, also apparently in conjunction with an earlier application for social security benefits. With regard to her daily activities, Leckenby told Dr. Lutz that "her husband helps her with all chores and meals, as she cannot do any of these tasks without pain" and that "her husband frequently does the shopping," *id.* at 204, although she sometimes went shopping because her mother encouraged her to get out of the house more, *id.* at 203. Dr. Lutz stated that Leckenby's inconsistent response profile on the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") test he administered "could" indicate symptom exaggeration as a "cry for help" or "an attempt to obtain benefits." *Id.* at 205. Dr. Lutz concluded that Leckenby had a medical pain disorder likely exacerbated by psychological factors.

State-agency reviewing psychologist Geoffrey Sutton, Ph.D., reviewed Leckenby's existing mental health records in August 2004. Dr. Sutton agreed with

---

[3] "An MSS is a checklist evaluation in which the responding physician ranks the patient's abilities, and is considered a source of objective medical evidence." *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (internal quotation omitted).

Dr. Lutz's conclusions except for noting that, in his opinion, no conclusions should have been drawn from the results of Leckenby's MMPI-2 test. Dr. Sutton completed a Residual Functional Capacity Assessment form, similar to an MSS, stating that Leckenby was "markedly" limited in her ability to understand, remember and carry out detailed instructions but would be able to understand, remember and carry out simple to moderately complex instructions. Dr. Sutton also stated that Leckenby was "moderately" limited in her ability to interact appropriately with the general public, to accept instruction and respond appropriately to criticism from supervisors, to be aware of normal hazards and take appropriate precautions, and to set realistic goals or make plans independently of others.

Sleep disorder specialist John Brabson, M.D., diagnosed Leckenby with severe obstructive sleep apnea in February 2004. Dr. Brabson prescribed a CPAP, or "continuous positive airway pressure," breathing machine with a mask worn over the nose during sleep. In a follow-up examination in May 2005, Dr. Brabson noted that Leckenby continued to use the breathing machine as directed and that it adequately treated her sleep apnea. Dr. Brabson attributed Leckenby's continuing complaint that she was still "somewhat sleepy during the day" to side-effects from her pain and anti-anxiety medications. *Id.* at 435.

Physician David Kent, M.D., treated Leckenby on at least eight occasions from June 2004 through January 2005. In June 2004, Dr. Kent noted Leckenby's ongoing symptoms of fibromyalgia, depression and carpal tunnel syndrome in both wrists. Dr. Kent prescribed a combination of three pain medications and recommended counseling, rather than new medication, for her depression because it had not responded to "multiple attempts at antidepressant agents." *Id.* at 334. However, Leckenby apparently continued taking Lexapro for her depression. Dr. Kent also ordered magnetic resonance imaging ("MRI") of Leckenby's right knee, which revealed a horizontal tear in the right medial meniscus. After surgery to repair the torn meniscus in August 2004, Dr. Kent noted that the condition of Leckenby's right

knee had greatly improved.  In January 2005, Dr. Kent also reported that surgical relief for Leckenby's carpal tunnel syndrome had been "very, very helpful to her." *Id.* at 383.  Throughout these months, however, Dr. Kent consistently noted that the diffuse pain, tenderness and hypersensitivity to touch characteristic of fibromyalgia continued unabated and that various prescribed medications failed to reduce Leckenby's reported pain or improve her sleep at night.

Orthopedic specialist Richard Seagrave, M.D., treated Leckenby's torn meniscus.  In a March 2005 follow-up visit, an MRI on the knee showed no more abnormality.  Dr. Seagrave advised exercise, weight loss and a "positive attitude" and noted his impression that Leckenby was capable of more exercise on a daily basis.  *Id.* at 350.

Rheumatologist Joseph Mayus, M.D., treated Leckenby on at least four occasions from approximately September 2004 through August 2005.  During this time, Dr. Mayus recorded continuing objective and, in his view, credible subjective symptoms of fibromyalgia and depression consistent with the impressions of the other physicians, noting that Leckenby "[a]ches continuously from day to day" and was "[p]oorly tolerant of any activity because of worsening pain," *id.* at 374, "still has chronic, diffuse unremitting pain" and "get[s] out of bed six to eight times a night because of pain," *id.* at 442.  Dr. Mayus prescribed new medications in addition to the several Leckenby was already taking.  The record also contains an MSS form from Dr. Mayus dated October 29, 2004, stating that he began treating Leckenby in September 2004.  The MSS form states that Leckenby was suffering from fibromyalgia, chronic fatigue, morbid obesity and depression.  It also states that Leckenby would miss work about four days a month due to her impairments and could stand for a total of less than two hours, could sit for a total of at least six hours, and would need unscheduled 20-minute breaks on an average of three occasions during an eight-hour workday.  *Id.* at 339-41.  In addition, Dr. Mayus recorded that Leckenby would be unable to perform detailed, complicated or fast-paced tasks and that her symptoms would occasionally

interfere with the attention and concentration needed to perform even simple work tasks. In March 2005, Dr. Mayus completed another MSS form dealing more specifically with the effect of Leckenby's illness on her mental abilities. This form noted "moderate" limitations on Leckenby's ability to maintain attention and concentration for extended work periods (defined as the approximately two-hour work periods between normal breaks), to follow a schedule and be punctual and to work at a consistent pace without an unreasonable number and duration of rest periods.

Psychiatrist Arifa Salam, M.D., treated Leckenby in December 2004 and again in March 2005. Dr. Salam's March 2005 treatment notes state that Leckenby "continues to have multiple psychological / social stressors" including health and financial problems and that Leckenby's "[p]sychological activity was slow," "[h]er insight is slightly limited" and "[h]er judgment was adequate." *Id.* at 400A. In an MSS form dated June 2005,[4] Dr. Salam stated that Leckenby was "markedly" limited in her ability to maintain attention and concentration for extended (approximately two-hour) work periods, to follow a schedule and be punctual and to work at a consistent pace without an unreasonable number and duration of rest periods. *Id.* at 418. The MSS form also stated that Leckenby was "moderately" limited in her ability to understand, remember and carry out detailed instructions, to coordinate or work in proximity to others, to accept instruction and respond appropriately to criticism from supervisors, and to maintain socially appropriate behavior. *Id.* at 417-19.

After her application for benefits was denied, Leckenby received a hearing before an Administrative Law Judge ("ALJ") in May 2005. Leckenby testified that she was 36 years of age, married, with a nine-year-old daughter and a three-year-old son. With regard to her daily activities, Leckenby testified that her ability to drive a car was very limited and that her husband did most of the laundry, helped her prepare

---

[4]This form was accepted by the Administrative Law Judge ("ALJ") as an exhibit after Leckenby's May 2005 hearing.

meals and did all of the household cleaning. Leckenby testified that she shopped for clothing and groceries "once in a while" using a motorized cart, watched television, went for short walks and operated her computer. She also stated that she provided care for her children.

With regard to her condition and abilities, Leckenby testified that she could walk half a mile with breaks, lift only five to ten pounds, and sit or stand continuously only five to ten minutes at a time. She stated that, on an average day, pain caused her to lie down five or six times per day for 30 minutes at a time between the hours of 8:00 a.m. and 5:00 p.m. She stated that she had difficulty handling small objects, that her knee surgery did not resolve the pain in her knee and that she had day-long headaches two or three days per week. She also stated that her sleep was disrupted by pain, that she suffered from depression and that, after her gall bladder surgery in 2001, she frequently suffered from diarrhea. In addition, she claimed that her prescription medications made her feel light-headed and upset her stomach.

Following the five-step process outlined in 20 C.F.R. §§ 404.1520 and 416.920, the ALJ found that Leckenby was not gainfully employed; that she suffered from the severe impairments of obesity, fibromyalgia and depression; and that her mental impairment resulted in slight restriction of the activities of daily living, moderate limitation of social functioning, moderate limitation of ability to maintain concentration, persistence and pace, and no episodes of decompensation of extended duration. The ALJ found that these impairments did not meet or equal in severity the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 and that Leckenby's residual functional capacity ("RFC")[5] did not allow her to perform her past relevant work. However, based on the testimony of an impartial vocational expert, the ALJ

---

[5]"RFC is defined as 'the most [a claimant] can still do despite' his or her 'physical or mental limitations.'" *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004) (quoting 20 C.F.R. § 404.1545(a)).

found that Leckenby could perform a range of unskilled jobs at the sedentary exertional level. Therefore, the ALJ denied disability benefits.

In determining that Leckenby's RFC would allow her to perform work at the sedentary exertional level, the ALJ rejected in part the RFC opinions reflected on the MSS forms of treating physicians Dr. Cunningham, Dr. Mayus and Dr. Salam. In particular, the ALJ rejected the three physicians' opinions that Leckenby would be unable to complete an eight-hour workday without rest periods, or "unscheduled breaks," that would be unreasonable in number and duration because (1) these opinions were unsupported by each physician's treatment notes or clinical or diagnostic testing, and (2) they were inconsistent with the other evidence of record. The inconsistent evidence cited by the ALJ included the fact that Leckenby had "overall required relatively little treatment," that state-referred physician Dr. Hayes had found Leckenby's functional limitations to be entirely subjective, and that state-referred psychologist Dr. Lutz had found possible symptom exaggeration. The inconsistent evidence also included the ALJ's finding that the daily activities Leckenby described in her written application for benefits and to Dr. Lutz suggested a "fairly normal range of daily activities." In addition, the ALJ rejected the RFC opinion of state reviewing psychologist Dr. Sutton because he was not privy to the full record available to the ALJ.

The Commissioner's Appeals Council denied review, and the district court affirmed the decision of the ALJ. On appeal, Leckenby argues that the ALJ failed to assign proper weight to the opinions of her treating medical sources regarding her RFC. Leckenby asserts that if those opinions are properly credited, a finding of disability must ensue.

## II.    DISCUSSION

Our standard of review is as follows:

> We review de novo the District Court's determination of whether substantial evidence on the record as a whole supports the ALJ's decision.  Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision.  In our review, we consider the evidence that supports the ALJ's decision, as well as the evidence that detracts from it, and we will uphold the ALJ's decision if it is supported by substantial evidence on the record as a whole even if more than one conclusion could be drawn from the evidence.  We do not reweigh the evidence presented to the ALJ, and we defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (internal quotation and citations omitted).

Leckenby contends that the ALJ erred in partially rejecting the RFC opinions on the MSS forms prepared by treating physicians Cunningham, Mayus and Salam. "The [social security] regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).  "We have upheld an ALJ's decision to discount a treating physician's MSS where the limitations listed on the form 'stand alone,' and were 'never mentioned in [the physician's] numerous records of treatment' nor supported by 'any objective testing or reasoning.'" *Reed*, 399 F.3d at 921 (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)) (alteration in *Reed*).  "Although a treating

physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007) (quoting *Hogan*, 239 F.3d at 961).

We first address whether substantial evidence supports the ALJ's determination that the rest-period requirements stated on the MSS forms were unsupported by each physician's own findings and the other medical evidence of record. The ALJ's action here is similar in nature to that in *Pirtle*, where an ALJ found that a fibromyalgia claimant's RFC included a recommended 15 minutes of rest every three hours during the work day but rejected a treating primary physician's recommendation of 30 minutes of rest every three hours. 479 F.3d at 935. We found that substantial evidence supported the ALJ's decision to disregard the treating primary physician's recommendation because a treating rheumatologist's contrary recommendation supported the ALJ's finding; the primary physician's recommendation stated that 30 minutes would be merely "beneficial," rather than "required"; and the primary physician's treatment notes did not indicate that he advised the patient to rest 30 minutes every three hours, or that the patient reported a need to rest for 30 minutes every three hours, or that the patient routinely asserted fatigue as a complaint. *Id.*

Likewise, in *Hacker v. Barnhart*, 459 F.3d 934 (8th Cir. 2006), a treating physician's RFC determination for a claimant suffering from fibromyalgia stated that the claimant "would frequently require unscheduled breaks" and could not tolerate "even minor physical exertion." *Id.* at 938 (describing the RFC opinion of Dr. Mittal). We found that substantial evidence supported the ALJ's decision to disregard these limitations where the physician's own treatment notes reported that the claimant "responded positively to pain treatment" and that the physician repeatedly admonished the claimant to exercise more often, in contradiction of the physician's own RFC finding that she could tolerate no physical activity. *Id.*

The record in the instant case does not contain the type of evidence that we found in *Pirtle* and *Hacker* to provide substantial support for an ALJ's decision to reject a treating physician's opinion. In contrast to *Pirtle*, where the ALJ credited a treating rheumatologist's opinion over the treating primary-care physician's, here the treating rheumatologist (Dr. Mayus) and a treating psychiatrist (Dr. Salam) both gave RFC opinions about the need for rest periods that substantially matched the RFC opinion of the treating primary-care physician (Dr. Cunningham), and the ALJ rejected all three opinions.[6] Also in contrast to *Pirtle*, all three treating physicians in this case noted that the unscheduled rest periods for Leckenby would be required rather than merely "beneficial." While none of the three physicians made treatment notes specifically reciting the need for rest periods as stated on the MSS forms,[7]

_____

[6]The ALJ noted that Dr. Cunningham's MSS form, with checked boxes indicating that Leckenby could only stand or walk for a total of less than one hour during an eight-hour workday and also could only sit for a total of less than one hour during an eight-hour workday, implied that Leckenby had to lie down for more than six hours during a typical eight-hour day. As the ALJ recognized, neither Leckenby nor any other treating physician reported that Leckenby required this level of bed rest. Elsewhere on the MSS form, however, Dr. Cunningham noted more specifically that Leckenby needed to lie down for 15 to 30 minutes on four to five occasions during an eight-hour day, far short of six hours total. In isolation, this inconsistency might constitute substantial evidence to support the ALJ's conclusion that Dr. Cunningham's entire MSS form was unreliable. *See Pirtle*, 479 F.3d at 935 ("When a treating physician's record includes inconsistencies, his own inconsistency may undermine or diminish the weight afforded to his opinion."). However, the exclusion of Dr. Cunningham's MSS form would not change our evaluation that the record as a whole does not provide substantial evidence to support a rejection of the other two treating physicians' RFC opinions. We note that the more specific notation on Dr. Cunningham's MSS form is consistent with the other two treating physicians' opinions and with Dr. Cunningham's treatment notes that Leckenby had constant trouble with pain in her shoulders, hips, back and legs.

[7]It does not seem unusual that a physician would see no need to make specific treatment notes on an unemployed patient's need for work breaks during a routine medical examination.

-11-

Leckenby's medical records are replete with consistent complaints of chronic pain, chronic fatigue and non-restorative sleep at night, and with treatment notes such as "[p]oorly tolerant of any activity because of worsening pain" by Dr. Mayus. Similarly, in contrast to *Hacker*, treatment notes here indicate that Leckenby did not respond positively to the numerous courses of pain medication prescribed by her several physicians and that only orthopedist Dr. Seagrave, who was treating Leckenby specifically for a torn meniscus rather than her fibromyalgia or depression, thought that she should be capable of increased physical activity. Therefore, we cannot say that "the limitations listed on the form[s] stand alone, . . . were never mentioned in the physician's numerous records of treatment [and were not] supported by any objective testing or reasoning." *Reed*, 399 F.3d at 921 (internal quotations and alterations omitted).

We next address whether substantial evidence supports the ALJ's finding that Leckenby's reported daily activities were inconsistent with the RFC opinions of her treating physicians. In evaluating a claimant's RFC, "'consideration should be given to . . . the quality of daily activities . . . and the ability to sustain activities, interests, and relate to others *over a period of time*' and . . . the 'frequency, appropriateness, and independence of the activities must also be considered.'" *Reed*, 399 F.3d at 922 (quoting Social Security Ruling 85-16) (emphasis in *Reed*). After carefully reviewing Leckenby's description of her daily activities throughout her claim proceeding and to Dr. Lutz, we cannot find substantial evidence to support the ALJ's finding that Leckenby engaged in a "fairly normal range of daily activities" inconsistent with the need for rest periods described by her treating physicians.

The ALJ stated that in her application for benefits, Leckenby said she could "do laundry, go shopping, do some cooking, dish-washing and house-cleaning, do errands at the post office, help her children prepare for school and supervise their activities when they return home, watch television, listen to music, use a computer and drive." Leckenby's actual responses on the application, completed in June 2004, do not

support the ALJ's characterization. Leckenby stated on the application that she "need[ed] help" with laundry because she cannot "lift/load" it, but that she could fold laundry if her husband brought her the clothes; that she could shop once per week "at most," needed frequent breaks while doing so and that usually her husband did the shopping; her husband prepared the family's meals; she did no dish-washing, house-cleaning or other chores; and that she went to the post office "rarely" and "mostly [her] husband or mom" went instead. Admin. Rec. at 155-56. The application states that she greeted her children in the morning, not that she helped them prepare for school, although it does state that she would "watch kids as they play independently & nap" in the afternoon. *Id.* at 156. The application states that she watched television and listened to music but that she "[could not] always concentrate, often fall asleep" and that she could not watch television for more than half an hour because she could not "be still that long or stay awake." *Id.* The application states that she usually found others to drive for her, but she drove herself short distances about three times per month. All of this is materially consistent with her description of her daily activities to Dr. Lutz in January 2004 and her testimony at the hearing in May 2005.

This case is similar to *Reed*, where we rejected an ALJ's finding that the claimant's ability to perform activities "such as fixing meals, watching movies, checking the mail, and doing laundry . . . to any degree is inconsistent with her allegations of constant, debilitating symptoms." 399 F.3d at 922. We held that the ALJ's conclusion lacked substantial evidentiary support because the record revealed "notable" limitations of the claimant's ability to perform many of the activities relied upon by the ALJ. *Id.* at 923 ("[The claimant] does 'a little bit of crafts,' but within an hour she is frustrated because of her inability to concentrate; she can make the bed, but not put on fitted sheets; she can do household chores, but cannot vacuum the floor or clean the bathtub; she can do the laundry but cannot carry the laundry basket; and, while she can go grocery shopping, she does so only 'if forced,' only with her mother-in-law, and only as long as they do not stay long."). The limitations on Leckenby's daily activities, which she described consistently on at least three occasions from

-13-

January 2004 through May 2005, are almost identical to those of the claimant in *Reed*. This record does not reveal the extensive level of daily activity that we have affirmed as being inconsistent with complaints of disabling pain. *Cf. Roberson v. Astrue*, 481 F.3d 1020, ____ (8th Cir. 2007) (affirming an ALJ's finding of no disability where the claimant "engaged in extensive daily activities," testifying "that she took care of her eleven-year-old child, drove her to school and did other driving, fixed simple meals for them, did housework, shopped for groceries, and had no difficulty handling money"). As a result, Leckenby's description of her daily activities does not provide substantial evidence to support the ALJ's rejection of the unscheduled break requirements listed in the MSS forms by the three treating physicians.

Viewing the entire record as a whole, we discover substantially similar RFC opinions from three independent treating physicians regarding Leckenby's need for rest periods that are consistent with the treatment notes of these and additional treating physicians, such as Dr. Kent, and that are also consistent with Leckenby's daily activities described throughout the application process. In light of all this evidence, the earlier notes on possible symptom exaggeration by one-time consultative examiners Dr. Hayes and Dr. Lutz, standing alone, do not constitute substantial evidence to support the ALJ's rejection of the treating physicians' opinions. Therefore, we do not find substantial evidence to support the ALJ's decision to reject the opinions of the three treating physicians regarding Leckenby's need for rest periods during an eight-hour workday.

## III.   CONCLUSION

We conclude that the ALJ erred by disregarding the opinions of treating physicians Dr. Cunningham, Dr. Mayus and Dr. Salam regarding Leckenby's need for rest periods. Accordingly, we remand to the district court with directions to remand to the ALJ for reconsideration consistent with this opinion. *See Reed*, 399 F.3d at 924.

_____