[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10506
Non-Argument Calendar
_____

D.C. Docket No. 8:14-cv-01434-MAP

EDDIE SAMPSON,

Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 13, 2017)

Before HULL, WILSON, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Eddie Sampson appeals the district court's order affirming the Administrative Law Judge's (ALJ") denial of his application for disability insurance benefits and supplemental security income, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), respectively. On appeal, Sampson offers two main challenges to the ALJ's decision. First, he contends that the ALJ failed to properly evaluate and weigh the medical opinions of his treating physicians and, as a result, crafted a residual functional capacity that was not supported by substantial evidence. Second, he contends that the ALJ failed to articulate adequate reasons for discrediting his testimony about his symptoms.

## I. Background

Sampson applied for disability benefits in August 2007. He was 50 years old on the alleged onset date of March 22, 2007. He has a GED and past relevant work as a crane operator, a tire repairer, a garbage collector, a sales route driver, and a floor coating installer. Sampson claimed that he was no longer able to work because of a combination of physical and mental impairments, including diabetes, vision problems, high blood pressure, gallbladder disease, Hepatitis C, depression, impulse control, personality disorder, and arthritic knees. His applications were denied initially and upon reconsideration.

Sampson requested and received a hearing before an ALJ. That hearing was held in September 2009. In November 2009, the ALJ rendered an unfavorable

2

decision.  Sampson appealed to the Appeals Council, which granted review and remanded the case for a new hearing and decision.  The same ALJ held a second hearing in March 2012 and then rendered a partially favorable decision, finding Sampson disabled after September 11, 2011, but not before.

## A.    *Relevant evidence before the ALJ*

Sampson testified at both administrative hearings.  At the first hearing in September 2009, Sampson testified that his physical impairments, primarily his arthritic knees and fatigue, prevented him from sitting for more than 30 minutes at a time, walking farther than short distances, and crawling or crouching altogether.  His daily activities included some housework, laundry, cooking, and driving.  Due to irritability and lack of impulse control, Sampson had difficulty getting along with others and had been seeing a therapist to help control his temper.

At the second hearing on remand from the Appeals Council in March 2012, Sampson stated that the condition of his feet and knees had worsened since the last hearing.  He could sit for fifteen to twenty minutes and stand unassisted for about ten minutes, and he could not walk farther than short distances.  Due to his diabetic peripheral neuropathy[1], both feet burned and pulsated all the time, and even worse when he sat for a long time.  He experienced drowsiness as a side effect of his

---

[1] Peripheral neuropathy is the result of damage to peripheral nerves.  Symptoms of peripheral neuropathy include numbness, tingling, and pain, usually in the hands or feet.  Peripheral neuropathy may also cause muscle weakness and loss of reflexes.  *See* Nat'l Diabetes Information Clearinghouse, Diabetic Neuropathies: The Nerve Damage of Diabetes, http://diabetes.niddk.nih.gov/dm/pubs/neuropathies (last visited June 8, 2017).

medications.  The ALJ noted on the record that Sampson twice stood up during the hour-long second hearing.

Medical records show that Sampson began receiving treatment from Elizabeth Quick-Koscho, M.D., at Community Health Centers in July 2006 for uncontrolled Type 2 diabetes mellitus and hypertension.  Sampson first complained of knee pain in May 2008.  An examination revealed bilateral knee crepitus and pain with palpation of the right lateral joint line, and an x-ray showed calcification of the patella.  Dr. Koscho prescribed Tylenol #3 (acetaminophen/codeine).  In August 2008, Sampson said that pain in his feet, knees, and ankles was preventing him from exercising, though in December 2008 he reported feeling good about starting an exercise routine.  In January 2009, Dr. Koscho again prescribed Tylenol #3.

From January 2009 through September 2009, Sampson saw doctors other than Dr. Koscho and continued to complain of knee pain.  On March 17, Sampson said that he needed a refill of Tylenol #3 for his knee pain.  On June 9, he said that knee and ankle pain were preventing him from walking or lifting weights.  On June 16, he said that he needed something stronger than Tylenol #3.  An examination on June 16 revealed bilateral knee crepitus, and Sampson was prescribed a trial of tramadol for his knee pain.  Sampson complained of anxiety and difficulty sleeping in July 2009.  On August 24, 2009, Sampson reported "continued and increasing

4

knee pain" that was "so bad he ha[d] been gritting his teeth and broke a denture." An examination revealed tenderness in both knees, and Sampson was diagnosed with knee-joint pain. Sampson's balance, gait, and stance were normal.

On September 11, 2009, Sampson returned to Dr. Koscho, complaining of persistent knee pain that was unresponsive to Tylenol #3. Dr. Koscho prescribed Ultram, a brand-name version of tramadol.

On that same date, Dr. Koscho completed a medical source statement about Sampson's ability to work. Based on Sampson's knee pain and stiffness and an x-ray that showed bilateral ossification of the inferior patella, Dr. Koscho opined that Sampson was limited in his ability to stand, walk, and sit. In an eight-hour workday day, Dr. Koscho said, Sampson could stand or walk for a total of two hours, for thirty minutes at a time, and he could sit for a total of three hours, for thirty minutes at a time. Sampson could not stoop, crouch, kneel, or crawl, though he could occasionally climb and frequently balance. The doctor also noted that Sampson had unspecified psychological issues that prevented him for working.

Sampson began treatment with Andrew Villamagna, M.D., a doctor of family medicine, on December 10, 2009. At his first visit, Sampson reported worsening knee pain, particularly in the morning and when rising from a seated position, as well as knee stiffness, intermittent knee locking, and a popping sound in the knee. An examination of the knees revealed "abnormal" appearance,

5

tenderness on palpation bilaterally, and pain with range-of-motion testing. Dr. Villamagna diagnosed hypertension, poorly controlled diabetes mellitus, and patellofemoral syndrome. The note from December 10 indicates that Sampson was to be referred to an orthopedist, and the record contains an orthopedic referral filled out by Dr. Villamagna. (Tr. 737). A follow-up visit on December 18 indicates that Dr. Villamagna again found tenderness on palpation of both knees and pain elicited by motion. The doctor diagnosed localized primary osteoarthritis in both knees.

The treatment records from December 2009 through May 2011 indicate no significant change in Sampson's symptoms. Joint knee pain and osteoarthritis are consistently listed as "Active Problems." These records generally note that Sampson was "self-reliant in usual daily activities," that his gait, stance, and balance were normal, and that no diabetic peripheral neuropathy was noted. On November 16, 2010, however, Dr. Villamagna stated that Sampson had complained that his ankles, feet, and knees were "very painful with pins and needles" and that it was difficult to walk or work out. The doctor noted that Sampson was being seen by a podiatrist for his feet.

On May 20, 2011, Sampson complained of moderate left knee-joint pain for the previous three weeks and was advised to see an orthopedist. Sampson had

bilateral tenderness on palpation in the suprapatellar region of the knee and left knee tenderness on palpation of the inferior pole patella and infrapatellar tendon.

Dr. Villamagna completed a medical source statement on May 28, 2011. According to Dr. Villamagna, Sampson's primary symptoms were moderately severe fatigue (rated as an 8 out of 10), moderate pain (rated as a 6 out of 10), depression, and mania. Dr. Villamagna opined that Sampson could sit for three hours total and stand or walk for two hours total in an eight-hour workday, and that he would need to get up and move around every fifteen minutes when sitting. Dr. Villamagna stated that Sampson's symptoms were frequently severe enough to interfere with his attention and concentration, and that during an eight-hour workday, he needed breaks to rest every fifteen minutes for fifteen minutes each time. Sampson's symptoms and limitations, according to the doctor, had been present since March 2009.

Sampson began seeing a podiatrist, Ian Klein, D.P.M., in May 2010. At his initial consultation with Dr. Klein, Sampson complained of burning, tingling, pulsations, and aching pain in his knees, legs, ankles, calves, and feet. An examination revealed decreased patellar and Achilles reflexes and decreased bilateral vibratory sensation and proprioception. Monofilament testing[2] was within

---

[2] A doctor may assess protective sensation or feeling in the feet by touching them with a nylon monofilament. People who cannot sense pressure from a monofilament have lost protective sensation and are at risk for developing foot sores that may not heal properly. Nat'l

normal limits.    Dr. Klein diagnosed diabetes with neuropathy, bilateral symptomatic diabetic polyneuropathy, and dystrophic toenails.    The podiatrist prescribed gabapentin for pain caused by peripheral neuropathy.

Later treatment notes reflect complaints of worsening pain and throbbing in Sampson's feet, as well as consistent findings that vibratory sensation and proprioception were decreased and that monofilament testing was within normal limits.    Based on Sampson's complaints of worsening neuropathic pain, Dr. Klein directed Sampson on multiple occasions to double his dosage of gabapentin. Sampson's prescription began at 300 mg/day and increased to 2400 mg/day in September 2010.    Sampson also had surgery to correct a hammertoe.

Dr. Klein completed a medical source statement related to Sampson's foot impairments in April 2011.    The doctor opined that Sampson was able to sit for eight hours total and to stand or walk for one hour total in an eight-hour workday, and that, while sitting, he needed to get up and move around every hour and not sit again for five minutes. The doctor relied on clinical findings of extremity pain and numbness, difficulty walking, and burning, tingling, and aching pain, as well as diagnostic testing which showed decreased reflexes and decreased vibratory

---

Diabetes Information Clearinghouse, Diabetic Neuropathies: The Nerve Damage of Diabetes, http://diabetes.niddk.nih.gov/dm/pubs/neuropathies (last visited June 8, 2017).

sensation.  Dr. Klein found that Sampson's limitations were present since at least May 2010.

In November 2011, Sampson underwent surgery of his left knee to repair a medial meniscal tear.  About one month later, he was evaluated by William Moore, M.D., at the request of the ALJ.  According to Dr. Moore, Sampson complained of "difficulty with pain in his knees beginning in 2011," with the left knee hurting more than the right.  Sampson also complained of pain and numbness from diabetic neuropathy, which had been present for years and the intensity of which he rated as, at times, 9 on a 10-point scale.  Both his knee pain and diabetic neuropathy pain were worse when walking.  An examination found an abnormal gait, an inability to walk on heels and toes without difficulty, an inability to squat, limited flexion of the left knee, and sensory deficits in both feet.

Dr. Moore also prepared a medical source statement, opining that, in an eight-hour workday, Sampson could sit for four hours total and for thirty minutes at a time, could stand for three hours total and for ten minutes at a time, and could walk for one hour total and for five minutes at a time.  Sampson could never stoop, crouch, crawl, or climb ladders.  Despite the limitations noted above, Dr. Moore found that Sampson was generally capable of caring for himself.

In January and February 2012, Sampson reported to Dr. Villamagna that his left knee did not seem to be healing and that he was having more difficulty

9

walking.  Sampson also complained of pain in his right knee.  The records for these two visits still indicate that he was "self-reliant in usual daily activities."

In addition to his physical impairments, the medical records show that Sampson received treatment for mental impairments beginning in 2007.  Pertinent to this appeal, Sampson began treatment in July 2009 at Suncoast Center for Community Mental Health, Inc., reporting symptoms of sleep disturbance, decreased appetite, difficulty concentrating, feelings of worthlessness, racing thoughts, and an irritable mood.  Sampson began treating with Edwin Jackson, M.D., a psychiatrist at Suncoast, on August 4, 2009.  On that date, after a mental-status examination, Dr. Jackson diagnosed Sampson with mood disorder NOS (i.e., not otherwise specified), reported a Global Assessment of Functioning ("GAF")[3] score of 50, and prescribed Lamictal.

At a follow-up visit on October 23, 2009, Sampson reported being happy with Lamictal, which had helped with his irritability.  Dr. Jackson noted that Sampson was "pleasant," his speech was normal in rate, volume, and tone, his mood and affect were congruent, he had no thoughts of self-harm, his thought content and thought processes were within normal limits, and his insight and

---

[3] The GAF scale is a numeric scale from 1 to 100 that mental health professionals sometimes use to evaluate an individual's occupational, psychological, and social functioning. *See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* 30–32 (4th ed. 2000).  Generally, lower scores indicate more severe impairments and higher scores less so.  According to the DSM-IV, a GAF score between 41 and 50 indicates serious symptoms or impairments.  *See id.* at 32.

judgment were normal.  Sampson reported decreased irritability on November 30, 2009.  In March 2010, Dr. Jackson again increased Sampson's dose of Lamictal. In May 2010, Sampson reported doing well on Lamictal but stated that he had been feeling "extremely angry" because his girlfriend's alcoholic step-son was living with them.  Dr. Jackson noted that Sampson appeared somewhat depressed.  Dr. Jackson prescribed Lamictal, Trazodone, Klonopin, and Celexa.

Dr. Jackson completed a medical source statement on May 19, 2010.  He listed diagnoses of mood disorder and rule out bipolar disorder, and he stated that Sampson's GAF score was 45, with a low score of 40 in the previous year.  Based on clinical findings including poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, social withdrawal or isolation, decreased energy, hostility and irritability, and severe anger with hostility, Dr. Jackson opined that Sampson was markedly limited in numerous areas of functioning and moderately limited in several others. Sampson, Dr. Jackson stated, was not capable of even low-stress work due to mood swings, hostility, and anger.

## B.    *ALJ's partially favorable decision*

On April 20, 2012, the ALJ issued a written decision finding Sampson disabled as of September 11, 2011, but not before.  Applying the five-step sequential evaluation process, the ALJ determined that Sampson had the following

severe impairments:  obesity, diabetes mellitus, essential hypertension, history of hepatitis, bilateral osteoarthritis of the knees, and bipolar disorder with anxiety and depression.  Concluding that Sampson's impairments did not meet or equal one of the impairments listed in the social security regulations, the ALJ went on to assess Sampson's residual functional capacity ("RFC").

Upon reviewing Sampson's medical records, medical opinions from various physicians, and Sampson's testimony, the ALJ concluded that before September 11, 2011, Sampson had the RFC to do light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations:  he could not climb ladders, ropes, or scaffolds; he could not work around unprotected heights; he could kneel and climb ramps or stairs occasionally; he could understand, remember, and carry out simple, routine, repetitive procedures and instructions; he could make simple and routine adjustments to work procedures; he could make basic work-related decisions; and he could tolerate occasional interaction with others.

The ALJ based the RFC assessment on "the medical record; [his] observations of the claimant during the hearing; and the medical opinion of Dr. Klein."  Although this RFC left Sampson unable to perform his past relevant work, the ALJ found that there were jobs in the national economy he could have performed.  Accordingly, the ALJ found that Sampson was not under a disability

from the onset date to September 11, 2011. Sampson's RFC after September 11, 2011, the date of his 55th birthday, includes one additional limitation: he was "able to sit for no more than 15 minutes at a time and stand for no more than 15 minutes at a time."

With regard to the medical opinions, the ALJ gave "little weight" to the opinions of every treating physician but Dr. Klein. Regarding Dr. Klein, the ALJ "agree[d] with his view that the claimant is able to sit for eight hours in an eight-hour workday" and gave that aspect of his opinion "moderate weight." But the ALJ "d[id] not agree with his view that [Sampson] is not able to stand or walk for more than an hour." The ALJ disagreed with that view because the doctor "never once in his treatment notes . . . advise[d] Sampson to limit his standing or walking," an advisement the ALJ "expect[ed] to find" if Sampson were as limited as the medical source statement indicated. The ALJ therefore gave "little weight" to Dr. Klein's opinion regarding Sampson's ability to stand or walk.

The ALJ gave little weight to Dr. Villamagna's opinion because many of the limitations he indicated were inconsistent with his own treatment records, he did not cite medical evidence to support some of the limitations, and he addressed some areas beyond his specialty, specifically Sampson's mental impairments. The ALJ also gave little weight to Dr. Koscho's opinion because he could not determine which doctor had completed the assessment, the treatment records did

13

not support the limitations in the opinion, and the ALJ's observations of Sampson during the hearing "directly contradict[ed]" the opinion expressed in the statement. Finally, the ALJ gave Dr. Jackson's opinion little weight because it contradicted both the treatment record at Suncoast and the ALJ's observations of Sampson during the hearing.

Addressing Sampson's subjective testimony, the ALJ found that Sampson's complaints of pain and symptoms were not fully credible prior to September 11, 2011, even though his impairments could reasonably be expected to cause the alleged symptoms. The ALJ concluded, however, that Sampson's allegations regarding his symptoms and limitations were generally credible beginning around September 11, 2011. By that point, the ALJ stated, "the condition of his knees due to osteoarthritis, obesity, and a tendon tear in the left knee had become serious enough for him to undergo an operation on November 18, 2011." And since that operation, the ALJ explained, Sampson had suffered from intense knee pain that significantly restricted his ability to walk, stand, or climb.

The Appeals Council denied review of the ALJ's second decision. Sampson then sought judicial review in federal district court. *See* 42 U.S.C. § 405(g). A magistrate judge, exercising jurisdiction based on the consent of the parties, affirmed. *See* 28 U.S.C. § 636(c). Sampson now appeals.

14

## II.  Discussion

### A.    *Standards of review*

"In Social Security appeals, we must determine whether the [ALJ's] decision is supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotation marks omitted).  Review for substantial evidence is deferential; we must affirm if a reasonable basis exists in the record for the conclusion reached.  *See id.* We may not reweigh the evidence or decide the facts anew.  *Id.*  We review "legal conclusions *de novo* because no presumption of validity attaches to the [ALJ's] determination of the proper legal standards to be applied in evaluating claims." *Davis v. Shalala*, 958 F.2d 528, 531 (11th Cir. 1993).

Although our review is deferential, "[w]e must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence."  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  The ALJ must state with at least some measure of clarity the grounds for his decision, and we will not affirm "simply because some rationale might have supported the ALJ's conclusions."  *Winschel*, 631 F.3d at 1179.

### B.    *Disability framework*

To be eligible for disability insurance benefits or supplemental security income, a claimant must be under a disability, which means the claimant is unable

to work on a regular and continuing basis. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The Social Security regulations outline a five-step process to be used to determine disability for both claims. *Id.* The claimant has the burden to prove that (1) he "has not engaged in substantial gainful activity," (2) he "has a severe impairment or combination of impairments," and (3) his "impairment or combination of impairments meets or equals a listed impairment," which results in an automatic finding of disability. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). If the claimant cannot prevail at the third step, he must prove at the fourth step that he is "unable to perform [his] past relevant work." *Id.*

At the fourth step, the ALJ must determine the claimant's RFC, which is an assessment of a claimant's remaining ability to work despite his impairments. *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). If, based on the RFC, a claimant cannot return to his past relevant work, the ALJ moves on to step five, where the burden shifts to the Commissioner to show that "there is other work available in significant numbers in the national economy that the claimant is able to perform." *Jones*, 190 F.3d at 1228. If the Commissioner meets that burden, "the claimant must prove that []he is unable to perform those jobs in order to be found disabled." *Id.*

## C.    *Medical opinion evidence*

The focus of Sampson's appeal is that the ALJ failed to property evaluate

16

the medical opinions of his treating physicians and, as a result, crafted an RFC that lacks the support of substantial evidence. Sampson broadly contends that the ALJ failed to provide good reasons for discounting these opinions and that, contrary to the findings of the ALJ, his physicians' treatment notes were consistent with the limitations assessed in the opinions.

When determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, medical opinions, and subjective testimony. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Medical opinions are statements from physicians and other medical sources that reflect judgments about the nature and severity of the claimant's impairments, including both symptoms and resulting limitations. *Winschel*, 631 F.3d at 1178–79.

Under the relevant regulations, the ALJ must give "controlling weight" to an opinion from a treating source if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Likewise, we have stated that, absent "good cause," a treating physician's opinion is entitled to "substantial or considerable weight." *Winschel*, 631 F.3d at 1179. Such "good cause" exists when (1) the physician's opinion was not bolstered by the evidence, (2) the evidence supported a contrary finding, or (3) the physician's opinion was conclusory or inconsistent with his or her own medical records. *Id.* If the ALJ

17

does not grant controlling weight to the treating physician's opinion, the ALJ still must weigh the opinion based on various factors outlined in the regulations. *See* 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).

The ALJ must clearly articulate the weight given to different medical opinions and the reasons for doing so. *Winschel*, 631 F.3d at 1179. When the ALJ's articulated reasons for assigning limited weight to a treating physician's opinion are supported by substantial evidence, there is no reversible error. *See Moore*, 405 F.3d at 1212. With these general principles in mind, we turn to an evaluation of the opinions at issue.

### 1.    Dr. Klein

Dr. Klein, who had been seeing Sampson regularly since May 2010 for his foot impairments, opined in April 2011 that Sampson's ability to stand and walk in an eight-hour workday was significantly restricted and that he could not sit for longer than an hour without having to get up and move around for five minutes. In giving all but a small part of this opinion little weight, the ALJ did not cast doubt on Dr. Klein's diagnostic techniques or clinical findings or explain why they did not support the limitations assessed. Nor did the ALJ cite other record evidence to contract Dr. Klein's opinion. Instead, the sole reason given by the ALJ for rejecting Dr. Klein's opinion was that the doctor in his treatment notes never

18

advised Sampson to limit his standing or walking.  On this record, this reason does not amount to good cause.

As other circuits have noted, there is a "distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's ability to work."  *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008); *see Leckenby v. Astrue*, 487 F.3d 626, 633 n.7 (8th Cir. 2007); *cf. Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987) (doctor's statement in a treatment note that a claimant was "significantly better" during a visit did not provide a "sound basis" for rejecting the doctor's assessment of the claimant's inability to work).  "The primary function of medical records is to promote communication and recordkeeping for health care personnel."  *See Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007).  It is "not to provide evidence for disability determinations." *Id.*  The mere fact that a doctor's judgments about a claimant's work-related limitations are not expressly reflected in treatment notes does not necessarily mean that the judgments are inconsistent with the treatment notes.

We take the ALJ's point to be that Dr. Klein's treatment notes do not support the severity of the restrictions in his assessment.  But the ALJ did not explain, nor is it apparent, why Dr. Klein's opinion was not supported by his findings or was inconsistent with other substantial evidence.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The doctor based his assessment on the diagnosis

19

of Type II Diabetes Mellitus with neuropathic complications, clinical findings of extremity pain and numbness, difficulty walking, and burning, tingling, and aching pain, and diagnostic findings of decreased reflexes on testing and decreased vibratory sensation, all of which are reflected in the treatment notes. The notes also reflect Sampson's repeated complaints of worsening pain and throbbing in his feet and limbs, for which Dr. Klein doubled Sampson's pain medication on at least three occasions. That Sampson's neuropathy impaired his ability to stand or walk, particularly for longer periods of time, is also supported by Dr. Moore's evaluation in November 2011. Dr. Moore specifically noted that Sampson's ability to walk was impacted by his peripheral neuropathy pain. And only Dr. Moore and Dr. Klein offered an opinion about how Sampson's diabetic peripheral neuropathy would affect his ability to work. In light of this evidence, and based on the limited explanation provided by the ALJ, we find no substantial evidence to support the ALJ's conclusion that Dr. Klein's opinion was inconsistent with or not supported by his medical findings.[4]

We also agree with Sampson that the ALJ erred in its treatment of another part of Dr. Klein's opinion. The ALJ failed to incorporate into the RFC finding

---

[4] We recognize that the ALJ found Sampson's complaints of pain due to diabetic neuropathy "not fully credible." But the ALJ did not discuss this finding in relation to Dr. Klein's opinion, it is not offered by the Commissioner as a reason for deferring to the ALJ's decision, and we may not affirm "simply because some rationale might have supported the ALJ's conclusions." *See Winschel*, 631 F.3d at 1179. Moreover, the ALJ stated that there was nothing in the record "to verify objectively his claims of sensory loss," but Dr. Klein's records show that diagnostic testing found decreased reflexes, vibratory sensation, and proprioception.

Dr. Klein's view that Sampson needed to get up and move around every hour and not sit again for five minutes or to give a reason for not doing so. In response, the Commissioner argues that, because Dr. Klein responded "no" to the question of whether it would be necessary or medically recommended for Sampson "not to sit continuously in a work setting," the omitted limitation was merely a "suggestion," not an actual work-related limitation that the ALJ needed to address or include.

While the Commissioner's interpretation of Dr. Klein's assessment may be reasonable, we cannot tell from the face of the assessment what Dr. Klein intended by his responses, given that he included the specific statement that Sampson needed to get up and move around once every hour and not sit again for five minutes. Because the ALJ did not discuss or resolve this ambiguity or inconsistency, we may not decide the facts anew and resolve the issue ourselves. *See Winschel*, 631 F.3d at 1178. Moreover, because we have found that substantial evidence does not support the ALJ's decision to discount the remainder of Dr. Klein's opinion, we cannot conclude that the ALJ's omission of the doctor's additional sitting limitation was harmless. And the Commissioner does not dispute Sampson's assertion that the additional limitation, if it is in fact a limitation, is material to the disability determination.

Accordingly, we conclude that the ALJ's stated reasons for discounting Dr. Klein's opinion are not supported by substantial evidence. *See id.* at 1179.

2.    Dr. Koscho and Dr. Villamagna

Dr. Koscho, who had been treating Sampson since 2006, opined in September 2009 that Sampson was significantly limited in his ability to sit, stand, walk, and alternately sit and stand based on knee pain and stiffness and an x-ray that showed bilateral ossification of the inferior patella. In May 2011, Dr. Villamagna, who had been treating Sampson since December 2009, reported similar restrictions in Sampson's ability to sit, stand, walk, and alternately sit and stand because of fatigue and constant, arthritic knee pain. The ALJ gave these opinions little weight because, among other reasons, the opinions were inconsistent with or not supported by the doctors' treatment notes.

After careful review, we find that substantial evidence supports the ALJ's decision to give these opinions little weight. As the ALJ explained, Sampson did not complain of knee pain until May 2008, more than a year after the alleged onset date. While the treatment records reflect that Sampson was diagnosed with osteoarthritis, that he experienced persistent pain in his knees, and that examinations occasionally found pain, tenderness, and crepitus, the records also indicate that the pain was mostly being managed by medication and that it was not severe enough to affect his gait. Despite a few complaints by Sampson, mostly in 2009, that the Tylenol #3 medication was not strong enough, it appears that he continued to take Tylenol #3 from 2009 through 2011. And as the district court

22

noted, "After December 2009, there is no record that [Sampson] complained he was in constant pain and his medications were not working." For example, the medical records from December 2009 through May 2011, when Dr. Villamagna completed the assessment, show only occasional complaints of pain related to his knees; the majority of these records do not contain any findings specific to knee pain. The fact that Sampson underwent knee surgery in November 2011 supports the ALJ's determination that Sampson's knee impairments were less severe before that time.

In sum, the ALJ articulated good cause for giving little weight to the treating physicians' opinions about Sampson's physical limitations, and substantial evidence supports the ALJ's determination that, prior to September 11, 2011, Sampson did not have knee impairments that would result in the severe degree of work-related limitations indicated by both Dr. Koscho and Dr. Villamagna.[5]

Sampson also takes issue with some of the other reasons given by the ALJ for rejecting these two opinions.[6] He asserts that ALJ relied on the same "flawed reasoning," as discussed above with regard to Dr. Klein's opinion, "that the

---

[5] As for Dr. Villamagna's opinion about the complicating effects of Sampson's bipolar disorder, that opinion is not supported by the treatment notes, which repeatedly state that Sampson had no behavioral complaints or difficulty carrying out daily activities as a result of depressive symptoms. And, as the ALJ noted, Dr. Villamagna primarily treated Sampson's physical impairments. Finally, Dr. Villamagna's opinion that Sampson would miss three or more days per month was conclusory because the doctor did not cite any medical evidence to support that limitation.

[6] Both parties agree that Dr. Koscho completed the September 2009 assessment, so the ALJ's inability to determine the identity of its author did not provide good cause.

treatment notes did not contain functional limitations for [Sampson]."  We conclude, however, that, in contrast to the ALJ's review of Dr. Klein's opinion, substantial evidence supports the ALJ's finding that the limitations assessed by Dr. Koscho and Dr. Villamagna were inconsistent with or not supported by the treatment notes.

Sampson also contends that the ALJ engaged in improper "sit and squirm" jurisprudence by relying on an observation of Sampson during the hearing—that he sat for an hour and exhibited no sign of pain or discomfort—to discredit Dr. Koscho's assessment.  The ALJ's reliance on this observation is problematic for a few reasons.  Not only does the observation suggest impermissible "sit and squirm" jurisprudence, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (finding that an ALJ improperly engaged in sit and squirm jurisprudence in relying on the observation "that claimant was not suffering pain of a disabling nature because [the claimant] did not appear to be in great pain at the hearing"), but also the stated observation appears to be inaccurate.  Contrary to the ALJ's stated observation, the ALJ noted on the record during the second hearing that Sampson stood up twice during the hour-long hearing, which suggests some pain and discomfort.  And, as Sampson notes, the ALJ appears to have made the observation during a period (post-September 2011) when Sampson was determined to be disabled.

24

Nevertheless, despite some problematic aspects of the ALJ's decision, we conclude that these errors are harmless under the circumstances because the ALJ articulated good cause for giving less weight to these treating physicians' opinions and substantial evidence supports the ALJ's determination that their opinions were inconsistent with or not supported by their treatment notes. *See Winschel*, 631 F.3d at 1179.

### 3.    Dr. Jackson

We conclude that substantial evidence also supports the ALJ's decision to give little weight to Dr. Jackson's May 19, 2010, medical-source statement because the opinion was inconsistent with or not supported by his treatment notes.[7] Although Dr. Jackson's medical opinion indicated that Sampson was markedly limited in several functional areas, Jackson's treatment notes indicated that Sampson's mental conditions were being treated and controlled by his medications. For example, Sampson routinely reported that his medication was helping "significantly," that things were going well, and that he was less irritable. Besides reporting some challenging issues at home relating to his girlfriend's adult children, treatment records largely reflect that Sampson's irritability, mood, and

---

[7] Because substantial evidence supports the ALJ's determination that Dr. Jackson's evaluation was inconsistent with treatment notes from Suncoast, we do not address Sampson's arguments that the ALJ erred by placing undue weight on the GAF scores.

25

anger—the primary mental symptoms Dr. Jackson indicated in his medical opinion—were largely controlled under the medication Sampson was prescribed.

Although the ALJ relied on observations of Sampson during the hearing, we do not believe that the ALJ engaged in improper "sit and squirm" jurisprudence by "subjectively arriv[ing] at an index of traits which he expects the claimant to manifest at the hearing." *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982). Rather, the ALJ relied on observations of specific aspects of Sampson's demeanor that related to the primary symptoms on which Dr. Jackson based his opinion. And the record shows that the ALJ considered these observations in conjunction with the medical evidence and did not "impose his observations in lieu of a consideration of the medical evidence presented." *Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985).

Accordingly, the ALJ articulated good cause, supported by substantial evidence, for giving little weight to Dr. Jackson's opinion.

## D.    *Residual functional capacity*

Next, Sampson argues that, by rejecting nearly every medical opinion in the record and relying on lay observations during the hearing, the ALJ fabricated the RFC "out of whole cloth." Sampson also contends that the ALJ failed to explain the basis of the RFC, thereby precluding effective judicial review. We disagree on both counts.

26

Although ALJs generally must give substantial or controlling weight to the opinions of treating physicians, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987). Because the substantial evidence supports the ALJ's decision to give little weight to the opinions of Dr. Koscho, Dr. Villamagna, and Dr. Jackson, the ALJ did not need to incorporate their assessments into the RFC.

More broadly, the ALJ adequately explained the basis of the RFC assessment, and substantial evidence supports the ALJ's RFC determination that prior to September 11, 2011, Sampson could perform light work with some additional limitations. In making his RFC finding, the ALJ took into consideration Sampson's symptoms for each condition, and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. With regard to Sampson's physical RFC, the ALJ limited him to light work that involved no climbing to accommodate (1) the dizziness Sampson experienced as a symptom of his diabetes; (2) the drowsiness Sampson experienced due to his hypertension medication; and (3) the fatigue Sampson experienced. To accommodate Sampson's osteoarthritis of the knees, the ALJ limited him to light work that involved no climbing or kneeling. And with regard to Sampson's mental RFC, the ALJ found that Sampson had moderate limitations in social functioning and concentration, persistence, or pace, and imposed

27

limitations to account for those limitations.  To account for these limitations, the ALJ limited him to light work that involved simple and routine tasks that involved no more than occasional interaction with other people.

Apart from the potential additional limitations suggested by Dr. Klein's opinion, which should be addressed upon remand, we conclude that substantial evidence supports the ALJ's determination and that the ALJ adequately explained the findings supporting each limitation imposed.  While the ALJ may have improperly relied on observations of Sampson during the hearing to reject Dr. Koscho's opinion, that error was harmless under the circumstances.  Additionally, the ALJ's reliance on observations of Sampson's demeanor during the hearing in relation to his mental impairments was permissible for the reasons explained above.  Overall, the ALJ properly assessed Sampson's RFC based on the relevant evidence (besides Dr. Klein's evaluation) and formulated an RFC that included all of the limitations supported by the record.

Sampson also challenges the ALJ's onset date of September 11, 2011.  He argues that the ALJ should have adopted his alleged onset date because the ALJ's RFC for the period of time after September 11, 2011, was consistent with the limitations indicated by the opinions from Dr. Koscho and Dr. Villamagna— specifically Sampson's need to alternate between sitting and standing frequently during the day.  However, Sampson did not present this argument to the district

court, so we decline to address it for the first time on appeal. *See Jones*, 190 F.3d at 1228 (issues not raised before the district court in a social security case are waived and may not be presented for the first time on appeal).

### E.    Credibility of Sampson's testimony

Finally, Sampson contends that the ALJ improperly discredited his subjective complaints of pain. Credibility determinations are the province of the ALJ, and we will not disturb a clearly stated credibility determination supported by substantial evidence. *See Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014). "Subjective pain testimony supported by objective medical evidence of a condition that can reasonably be expected to produce the symptoms of which claimant complains is sufficient to sustain a finding of disability." *Johns v. Bowen*, 821 F.2d 551, 557 (11th Cir. 1987).

The ALJ may discredit a claimant's subjective testimony so long as the ALJ provides "explicit and adequate reasons for doing so." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Where the ALJ makes no explicit finding, "the implication must be obvious to the reviewing court." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995)). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this

29

Court] to conclude that [the ALJ] considered [his] medical condition as a whole." *Id.* (internal quotation marks omitted).

Sampson maintains that the ALJ failed to make adequate credibility findings regarding his complaints of knee pain and psychiatric impairments. With regard to his knee pain, Sampson testified at the first hearing in September 2009 (before the ALJ found his complaints of pain credible) that he could sit no longer than thirty minutes at a time and that he could walk no farther than short distances. With regard to his mental impairments, Sampson said that he did not get along well with others, and he reported experiencing anxiety attacks up to four or five times per month, though less often when he took prescribed medications.

The ALJ observed that Sampson had medical conditions that could reasonably be expected to cause these symptoms, but that his "statements concerning the intensity, persistence and limiting effects of these symptoms" were not credible to the extent they were inconsistent with the RFC before September 2011. Substantial evidence supports the ALJ's determination.

In discounting Sampson's testimony regarding his knee pain, the ALJ did not, as Sampson contends, improperly discredit his testimony based solely on a lack of objective medical evidence. Rather, the ALJ's decision reflects that he considered, in addition to the objective medical evidence, the specifics of Sampson's testimony at the hearing, Sampson's daily activities, as reported by

both Sampson and his girlfriend, and the opinions of his doctors. The ALJ's reasons for discrediting Sampson's testimony were sufficiently clear and supported by the record. The ALJ's explanation was more than just a "broad rejection" and was sufficient to permit review. *See Dyer*, 395 F.3d at 1210.

The ALJ also did not err by discounting Sampson's testimony regarding his mental impairments. It appears that the ALJ's mental RFC broadly accounts for the limitations suggested by Sampson's testimony, and Sampson does not identify any particular aspect of his testimony that was rejected. To the extent Sampson claims more severe social and mental limitations, the ALJ reasonably discounted such testimony as unsupported by the objective medical evidence and inconsistent with Sampson's reports to Dr. Jackson and with the ALJ's observations of Sampson at the hearing. Accordingly, substantial evidence supports the ALJ's credibility finding with regard to Sampson's mental impairments.

### III. Conclusion

For the reasons stated, we conclude that the ALJ failed to provide good cause supported by substantial evidence for giving little weight to the medical opinion of Dr. Klein. Accordingly, we vacate the judgment of the district court in part and remand with instructions to remand this case to the Commissioner for further proceedings regarding Sampson's eligibility for benefits for the period before September 11, 2011. We express no opinion regarding Sampson's

31

eligibility for benefits on remand.  We affirm in all other respects.

**AFFIRMED in part; VACATED in part; REMANDED with instructions.**